2015 IL App (4th) 130702

NO. 4-13-0702

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| MARK WILLETT, | ) | No. 12CF344 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Peter C. Cavanagh, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Pope and Justice Holder White concurred in the judgment and
opinion.

**OPINION**

¶ 1     In May 2012, a grand jury indicted defendant, Mark Willett, on one count of

aggravated battery to a child (720 ILCS 5/12-3.05(b)(1) (West 2010)).  The indictment alleged

that in April 2012, defendant shook his two-month-old daughter, M.W., causing brain injury.  In

June 2013, a jury found defendant guilty of that offense.  In August 2013, the trial court

sentenced him to 16 years in prison.

¶ 2     Defendant appeals, arguing that he was denied a fair trial because the trial court

(1) allowed the State to argue an incorrect legal definition of "knowingly" during its closing

argument without permitting defense counsel to argue the correct definition, (2) refused to

instruct the jury on the lesser-included offense of reckless conduct (720 ILCS 5/12-5 (West

2010)), and (3) allowed the State's medical experts to describe M.W.'s injuries as "non-accidental." Because we agree that the court allowed the jury to render its decision based upon an incorrect definition of "knowingly," we reverse and remand for a new trial.

¶ 3                                     I. BACKGROUND

¶ 4         The grand jury indictment alleged, in pertinent part, that on or about April 27, 2012, defendant "knowingly and without legal justification, cause[d] great bodily harm or permanent disability to M.W., a child two months of age, in that said defendant shook M.W., causing injury to M.W.'s brain."

¶ 5         At defendant's June 2013 jury trial, the parties presented the following evidence, which we summarize only as needed to address the issues defendant raises on appeal.

¶ 6                             A. Taylor Williams' Testimony

¶ 7         Taylor Williams, defendant's girlfriend and M.W.'s mother, testified that M.W. was born two weeks premature in late February 2012, after approximately 30 hours of labor. In April 2012, Taylor and M.W. were living with defendant in a small, one-bedroom apartment in Springfield. Taylor identified photographs of the family's apartment and an image of a small, swinging baby cradle composed mostly of plastic and fabric, which the witnesses referred to as a "swing." Taylor testified that M.W. often slept in the swing, which was lined with a "very soft" blanket for extra padding.

¶ 8         On the morning of April 27, 2012, defendant, a 25-year-old fast-food worker, awoke at 6 a.m. for his 7 a.m. shift at Wendy's. Defendant had gone to bed at 3 a.m. and slept for only three hours. After defendant left for work, Taylor spent the first half of the day with M.W. Although M.W. was somewhat fussy that day, she seemed fine overall. Shortly before

3:30 p.m., Taylor's mother drove Taylor and M.W. to IHOP restaurant, where Taylor began her afternoon shift as a server. After dropping Taylor off at IHOP, Taylor's mother drove with M.W. to Wendy's to pick up defendant, who was getting done with his shift around that same time. Taylor's mother drove defendant and M.W. from Wendy's to the apartment, where she dropped them both off. Thereafter, defendant and two-month-old M.W. were alone in the apartment.

¶ 9    At approximately 6 p.m., Taylor called defendant, who reported that M.W. was "having troubles." Taylor could hear M.W. crying in the background. She told defendant to either feed M.W. or let her cry herself to sleep. During a second phone call, around 8 p.m., defendant told Taylor that M.W. "wasn't responding," and he needed to take her to the hospital. The trial court admitted several photographs, taken at the hospital, showing bruises around M.W.'s armpits, shoulders, and jaw, which Taylor testified were not present when she was with M.W. earlier that day.

¶ 10    B.  Officer Kathy Martin's Testimony

¶ 11    Officer Kathy Martin of the Springfield police department testified that at approximately 10 p.m. on April 27, 2012, she responded to a report of an injured child at the pediatric intensive care unit of St. John's Hospital. At the hospital, Dr. Mogal (whose first name does not appear in the record) informed Martin that M.W. arrived at the hospital pale, limp, and unresponsive. Mogal diagnosed M.W. with a "brain bleed" and told Martin that the injury "was not an accident" but, instead, was potentially caused by "shaken baby syndrome." (Defense counsel objected on hearsay grounds to Martin's testimony about what Mogal told her, but the trial court overruled the objection because the prosecutor claimed the testimony was "being offered for purposes of [Martin's] investigation." Defendant has not challenged this testimony on

- 3 -

appeal.)

¶ 12        Martin spoke with defendant at the hospital, who explained that he wanted to take a nap after arriving home from work at 3:30 that afternoon, but it was difficult to do so because M.W. was crying. According to defendant, M.W. eventually fell asleep, and when he tried to wake her, she was unresponsive. Defendant told Martin that he contacted his cousin, who came to the apartment and provided defendant and M.W. a ride to the hospital.

¶ 13                    C. Defendant's Police-Station Interview

¶ 14        Detective Brian Johnson of the Springfield police department testified that he went to St. John's Hospital at approximately 11 p.m. on April 27, 2012, where he spoke briefly with defendant. At approximately 1:20 a.m. on April 28, 2012, Johnson, accompanied by Detective Scott Kincaid, recorded an interview with defendant, which the trial court admitted into evidence and played for the jury.

¶ 15        In the interview, defendant stated that when he arrived home from work shortly after 3:30 p.m. on April 27, 2012, he made M.W. a bottle, fed her, burped her, and changed her diaper. M.W. was crying and being very fussy. At approximately 5:30 p.m., defendant put M.W. in her swing next to his bed, where she took a nap. Defendant also took a nap at that time. When he woke up at approximately 7:30 or 8 p.m., defendant found M.W. somewhat unresponsive, "breathing real heavy," and "gasping for air." Around that same time, defendant's cousin arrived at the apartment because the two had planned to hang out that evening. Defendant called Taylor to tell her that he and his cousin were taking M.W. to the hospital. Taylor told defendant that she would come to the hospital at the end of her shift.

¶ 16        Defendant initially denied shaking or dropping M.W. at all, explaining to the

- 4 -

detectives that he and Taylor were "pretty fragile" with M.W. The following exchange occurred:

"[JOHNSON]: Okay, well the injuries *** would have happened today. They would have happened even tonight. And, I mean, the problem with it is *** she's in your care.

[DEFENDANT]: Uh huh.

[JOHNSON]: Okay. And, I have kids, [Kincaid] has kids, and dude, it's tough. I'm not gonna sit here and bullshit you. I'm not gonna sit here and lie to you. And sometimes we make mistakes and, and accidents happen. And we don't mean to do them. And that's what they are. They're, they're accidents. It's not that you're intent to hurt your daughter. We know you didn't.

***

And you've got a screaming baby and *** you just don't know what to do. You might set her down on the bed a little hard and that happens.

[DEFENDANT]: Yeah.

[JOHNSON]: And that's what could've done that. If we get a *** little upset and we set her down on the bed a little hard or set her in the seat hard, that could've done it. But we've gotta figure out what did it so the doctors can help her and know what they need to do to fix it. Alright?

***

- 5 -

So, I mean, my question to you is could you accidentally shake her or set her down hard you think?

[DEFENDANT]: I, I don't never shake my baby at all, ever.

[JOHNSON]: I'm, not shake her, but if you set her down quick, I mean, babies, babies, their bodies, you know you could lay me down hard, you know what I mean, and I'd be ok. But babies, you set down hard and the momentum, the brain's not all the way full in their head and that could do it.

[DEFENDANT]: Yeah.

[JOHNSON]: You know?

[KINCAID]: Mark, what happened? Something happened tonight.

[DEFENDANT]: That, I mean I might have. But I, I don't think that I, you know, did anything harmful to her."

¶ 17        After Kincaid pressed that something must have happened to M.W. during the time defendant was caring for her, defendant stated that he set M.W. down in her swing when she was fussing. When Johnson asked defendant if he set her down "kind of fast," defendant stated, "hard, fast, yeah." Defendant elaborated, as follows: "She kept screaming, so I set her down. You know, not super fast, not, not real gentle or nothing either though. I set her down in her swing. She was swinging for a while. I put her pacifier in." Defendant stated that when he woke up, he noticed that M.W. was not "normal" and her breathing "wasn't right."

¶ 18    Kincaid then told defendant that M.W. was showing injuries consistent with being shaken.  He asked defendant to be honest.  Defendant responded, "like I said, I woke up, went to go feed her, she was a little bit fussy.  I shook her a little bit to wake her up a little bit."  (The interview video shows defendant physically demonstrating a gentle shaking, moving his hands back and forth a distance of one or two inches.)  When Kincaid asked defendant to again demonstrate how he shook M.W., defendant stated, "You know, shook her, just a little bit.  It wasn't like that [(defendant physically demonstrated a violent shaking, moving his hands quickly back and forth approximately 10 to 12 inches)].  I was, shook her a little bit [(demonstrating a gentle shaking)], she woke her eyes up.  I fed her a little bit."  Defendant later stated, "She was a little bit fussy so I shook her a little bit."  (We note that defendant stated at times during the interview that he shook M.W. that evening so she would stop crying and, at other times during the interview, he stated that that he shook M.W. to wake her up.)  Once M.W. stopped crying, defendant set M.W. on the bed, went to smoke a cigarette, and returned to find M.W. unresponsive and breathing heavily.

¶ 19    When Kincaid asked defendant why he shook M.W., defendant explained, "I was frustrated.  *** I had been sick, stressed out, just wanted her to stop crying."  Defendant estimated he gave M.W. 5 to 10 shakes while holding her under her armpits.  Her head was bouncing around "a little bit."  Defendant stated that he did not think he was hurting M.W. because she was not crying when he was shaking her.  The following exchange occurred:

"[JOHNSON]:  Mark, I mean, it was an accident, right?

[DEFENDANT]:  Complete accident.

[JOHNSON]:  You didn't, I mean—

- 7 -

[DEFENDANT]: I don't ever want to hurt my daughter,

you know, that's something a father never wants to do, I don't

think.

[JOHNSON]: But you understand you did, right?

[DEFENDANT]: Yes. I feel horrible about it. *** I don't

ever want to see her in pain."

¶ 20                                D. Dr. Kristine Alba's Testimony

¶ 21        Dr. Kristine Alba, a St. John's Hospital resident pediatrician who treated M.W. since birth, testified that M.W. was born a healthy baby. Although M.W. was born at 38 weeks (2 weeks earlier than the typical 40-week pregnancy), Alba testified that she considered 38 weeks "full term." After M.W. suffered her brain injuries, she developed a seizure disorder and developmental delays. The brain damage also made feeding and breathing difficult, which required insertion of separate breathing and feeding tubes.

¶ 22                                E. The State's Medical Experts

¶ 23        Prior to the testimony of the State's medical experts, defense counsel made an oral motion *in limine* to prohibit the experts from using the words "intentional" or "non-accidental" to describe M.W.'s injuries. Counsel argued that those terms were not medical diagnoses, but instead, legal conclusions about defendant's mental state. The State objected, contending that the words were medical terms of art used to describe the characteristics of certain types of trauma. The State further asserted that because the witnesses were experts, they could permissibly give opinions as to the ultimate issues in the case (*i.e.*, whether M.W.'s injuries were caused by accident). The trial court denied defendant's motion *in limine*.

¶ 24                                    1. *Dr. Leslie Acakpo Satchivi*

¶ 25          The trial court found Dr. Acakpo Satchivi qualified to testify as an expert in the field of pediatric neurosurgery, a field which the doctor described, as follows:

> "[Pediatric neurosurgery] is surgical and non-surgical management of diseases of the brain and spine, specifically in children, and it involves congenital anomalies, so disorders that children are born with, and it also involves treatment of acquired anomalies, such as trauma."

Acakpo Satchivi confirmed that, prior to trial, the State had contacted him and asked that he review M.W.'s "case" and give his "expert opinion on what could have caused the child's injuries." To prepare for his testimony, Acakpo Satchivi reviewed (1) M.W.'s hospital records and medical images, (2) transcripts of interviews with "the mother and grandmother," and (3) the recording of defendant's police-station interview.

¶ 26          Based upon his review of computed tomography (CT) scans of M.W.'s brain, Acakpo Satchivi determined that M.W. suffered from a "diffuse injury, some kind of global injury to the cerebral hemispheres." He also discovered a subdural hematoma (bleeding under the skull in the subdural space between the dura mater and the tissues covering the brain) and a subarachnoid hemorrhage (bleeding in the space between the tissues covering the brain and the brain itself). A later CT scan revealed a contusion (a bruise) on the back of M.W.'s brain, which Acakpo Satchivi opined could have been caused only by an impact. He explained that sections of M.W.'s brain had essentially died, resulting in severe and permanent brain damage.

¶ 27          After describing the physical characteristics of M.W.'s injuries, Acakpo Satchivi

explained the difference between "accidental" and "non-accidental" trauma, as follows:

> "Accidental trauma, just to use adjectives to make it a little
> more clearer [*sic*], it's more focal, so there's usually a single
> impact. There's potentially a skull fracture. You can definitely
> have subdural blood. You can have subarachnoid blood, but
> there's not the diffuse pattern of injury that you typically see in
> non-accidental trauma."

Acakpo Satchivi testified that M.W.'s injuries were consistent with nonaccidental trauma occurring within 24 hours of her admission to the hospital. He explained that subarachnoid and subdural bleeding can occur because "the blood vessels are anchored to the skull, but there are also fingers of blood vessels that go into the brain substance itself," which can tear when the "brain moves within the skull." Generally, shaking combined with an impact, or acceleration followed by a rapid deceleration, would cause the most damage to an infant's brain. Acakpo Satchivi estimated that a violent, "motor[-] vehicle-collision type force" was necessary to cause the damage he observed in M.W.'s brain, and that the person exerting the force would realize it was "excessive and harmful."

¶ 28        Acakpo Satchivi opined that M.W. "suffered a closed-head injury most likely at the hands of her father." He stated that he based this conclusion "on the review of the interview, and so on and so forth." When the State asked him whether he "assume[d] everything in [defendant's interview] is correct and true," he responded as follows:

> "The biggest issue I have with the interview is that at the
> start of the interview, [defendant] claims that nothing happened,

- 10 -

and then as the interview progresses, he begins to add facts, the things that occurred, the shaking, the laying down roughly, and that progression from saying one thing to saying more, you know, makes me wonder how much more there really is, but I've got to say there has to be some element of truth to what he's saying."

¶ 29     When the State asked Acakpo Satchivi whether a baby could suffer brain injury if slammed into M.W.'s swing, he stated it was possible that such injuries could occur, even if no external bruising was present.  When asked whether the same would be true if blankets were on the swing, Acakpo Satchivi stated, "Now we are kind of reaching.  I don't know for sure."

¶ 30     On cross-examination, Acakpo Satchivi testified that he "completely" agreed with the following statement, which came from a medical study he relied upon:  "The medical and imaging evidence, particularly where there's only central nervous system injury[,] cannot reliably diagnose intentional injury.  Only the child protection investigation may provide the basis for an inflicted injury."  When defense counsel asked Acakpo Satchivi why he concluded that M.W.'s injuries were nonaccidental, he stated, "because I did not base it solely on this imaging or the laboratory studies.  I also saw this interview."  Acakpo Satchivi also agreed with the statement that "[t]here's no scientific basis, to date, to indicate how much or how little force is necessary to produce a traumatic injury to the developing central nervous system."

¶ 31     Acakpo Satchivi acknowledged that M.W.'s injuries could "potentially" have been caused by "a vascular malformation," which he described as a type of "abnormality in the blood vessels that re-expose them to rupture and caus[e] similar bloody patterns on all the surfaces of the brain."  However, he could see no evidence of vascular malformation in M.W. and he did not

believe her injuries were consistent with that condition. He further testified that although childbirth can sometimes result in similar injuries, it was "unlikely" M.W.'s injuries were caused by childbirth.

¶ 32    On further cross-examination, Acakpo Satchivi admitted that (1) he could not know whether M.W. suffered from a vascular malformation prior to April 27, 2012; and (2) a newborn suffering from a subdural hematoma—which can be caused by a vascular malformation—may show no symptoms. He explained that subdural hematomas can occur during childbirth due to the forces exerted on the baby's head. Because babies born prematurely possess underdeveloped vascular systems, which are not as equipped to handle the pressures outside of the womb, premature babies have a higher tendency to suffer from brain bleeds. Babies who have suffered from brain bleeds are potentially vulnerable to "re-bleeds," which can be caused by increases in blood pressure. Coughing and shaking can increase blood pressure to the brain. Acakpo Satchivi testified that "[l]ittle or no force" can cause a re-bleed "[u]nder the right circumstances." He opined that a subdural hematoma occurring during childbirth would heal within two months.

¶ 33    Acakpo Satchivi admitted on cross-examination that he was unaware Taylor gave birth to M.W. two weeks prior to her due date following an induced labor that lasted more than 24 hours.

¶ 34                     2. *Dr. Reuben Nicholas Trane*

¶ 35    The trial court found Dr. Reuben Nicholas Trane qualified to testify as an expert in the field of pediatric radiology. Based upon his review of medical imagery of M.W.'s brain (and no other evidence), Trane opined that M.W. suffered from nonaccidental trauma, as

- 12 -

indicated by subdural blood on both the left and right sides of the brain. Trane explained that

accidental trauma, such as that which would occur during a car accident or a fall, usually

involves a focal point of bleeding on one side of the brain. Nonaccidental trauma, on the other

hand, is characterized by multiple points of bleeding on multiple sides of the brain. M.W.'s brain

scans showed diffuse points of bleeding throughout the brain, a type of trauma that Trane said

"raises the suspicion and says it's consistent with non-accidental trauma." He explained that "[i]n

the literature and in children who have had fatalities related to child abuse or non-accidental

trauma, they have reported that you see these same changes."

¶ 36          Defendant did not present evidence.

¶ 37                              F.  Jury Instructions and Closing Argument

¶ 38          At the jury-instruction conference, defendant asked the trial court to instruct the

jury on the lesser-included offense of reckless conduct (Illinois Pattern Jury Instructions,

Criminal, No. 11.37 (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th No. 11.37 (Supp.

2009))). The court refused to give the instruction, explaining its reasoning, as follows:

> "The court does find that reckless conduct is a lesser
>
> [-]included offense in this particular case, but in light of the
>
> evidence[,] and particularly the medical evidence in this case[,]
>
> and this lack of conflicting evidence, the instruction will not be
>
> given."

¶ 39          Defendant also requested an instruction on the definition of "knowingly" (Illinois

Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th

No. 5.01B (Supp. 2009)). The State objected, and the trial court refused that instruction as well,

- 13 -

reasoning that "the word 'knowingly' has plain meaning within a jury's common understanding." The court explained that it would give a definition of "knowingly" only if the jury asked for one. Defense counsel asked the court to reconsider its ruling, arguing that a person acts "knowingly" in the context of aggravated battery only if he is "consciously aware that his conduct is practically certain to cause great bodily harm." In response, the State contended that the "knowingly" element applies to the actions the defendant performs, not the bodily harm resulting from those actions. When defense counsel stated that she would object if the State espoused that view of the law during closing argument, the court told defense counsel, "you're going to feel the weight of the court come down on an objection that the court has previously made a ruling on[,] if in fact you argue that point in closing argument. So I think we need to follow the court's ruling during closing argument."

¶ 40        In closing argument, the State argued, among other things, that M.W.'s injuries were "indicative of non-accidental trauma, child abuse."

¶ 41        Defense counsel conceded in her closing argument that defendant shook M.W. out of frustration, which at least partially caused M.W.'s injuries. However, defense counsel asserted that the State failed to prove that defendant knowingly caused great bodily harm to M.W.

¶ 42        In rebuttal, the State argued, in pertinent part, as follows:

"I want to be absolutely clear with you. What we have to show is that when the defendant took actions and did things to [M.W.], that he knowingly acted in that way. We do not have to prove that when he committed these acts, that he knew the extent

of what her injuries would be."

¶ 43    As already stated, the jury found defendant guilty of aggravated battery to a child. In August 2013, the trial court sentenced him to 16 years in prison.

¶ 44    This appeal followed.

¶ 45                    II.  ANALYSIS

¶ 46    Defendant argues that he was denied a fair trial because the trial court (1) allowed the State to argue an incorrect legal definition of "knowingly" during its closing argument without permitting defense counsel to argue the correct definition, (2) refused to instruct the jury on the lesser-included offense of reckless conduct, and (3) allowed the State's medical experts to describe M.W.'s injuries as "non-accidental."  We address these arguments in turn.

¶ 47                 A.  The Meaning of "Knowingly"

¶ 48    Defendant first argues that the trial court erred by allowing the State to argue an incorrect legal definition of "knowingly" in closing argument without permitting defense counsel to argue the correct definition.  We agree.

¶ 49    During the jury-instruction conference, the State argued that to satisfy the "knowingly" element of aggravated battery, the State merely had to prove that defendant knowingly committed the acts that resulted in M.W.'s injuries.  Defense counsel disagreed and argued that the State had to prove defendant was "consciously aware that his conduct [was] practically certain to cause great bodily harm."  The court sided with the State and prohibited defense counsel from arguing her definition of "knowingly" during closing arguments.  We conclude that defense counsel had it right, and the court erred by allowing the State to argue an erroneous definition of "knowingly" during closing arguments.

- 15 -

¶ 50        Section 12-3.05(b)(1) of the Criminal Code of 1961 sets forth the crime of

aggravated battery to a child, as follows:

> "A person who is at least 18 years of age commits aggravated
>
> battery when, in committing a battery, he or she knowingly and
>
> without legal justification by any means:
>
>> (1) causes great bodily harm or permanent
>>
>> disability or disfigurement to any child under the
>>
>> age of 13 years ***[.]" 720 ILCS 5/12-3.05(b)(1)
>>
>> (West 2010).

¶ 51        In *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067, 594 N.E.2d 1374, 1381

(1992), the Second District explained that "when a statute is defined in terms of a particular

result, a person is said to act knowingly when he is consciously aware that his conduct is

practically certain to cause the result."  Applying this rule to the aggravated battery statute, the

court held that "a defendant, if he has been charged with acting knowingly, must be consciously

aware that his conduct is practically certain to cause great bodily harm."  *Id*.  This well-settled

rule is consistent with the pattern jury instruction defining "knowingly" (IPI Criminal 4th No.

5.01B (Supp. 2009)) and has been *explicitly* adopted in published opinions by each district of the

appellate court except for the Fifth District.  See, *e.g.*, *People v. Steele*, 2014 IL App (1st)

121452, ¶ 23, 19 N.E.3d 1084 ("A person acts knowingly if he or she is consciously aware that

his or her conduct is practically certain to cause great bodily harm.");  *People v. Isunza*, 396 Ill.

App. 3d 127, 132, 917 N.E.2d 1079, 1084 (2nd Dist. 2009) (same); *People v. Rickman*, 73 Ill.

App. 3d 755, 759, 391 N.E.2d 1114, 1117 (3rd Dist. 1979) (same); *People v. Dorn*, 378 Ill. App.

3d 693, 700, 883 N.E.2d 584, 589 (4th Dist. 2008) (same).

¶ 52    In this case, the State made the following statements in its rebuttal closing argument to the jury:

"I want to be absolutely clear with you.  What we have to show is that when the Defendant took actions and did things to [M.W.], that he knowingly acted in that way.  We do not have to prove that when he committed these acts, that he knew the extent of what her injuries would be."

¶ 53    In its brief to this court, the State characterizes the prosecutor's comments as "simply informing the jury that [the State] was not required to prove that defendant knew the precise or exact nature of the injury he was going to inflict."  We reject this argument because, although it is true that the State was not required to prove defendant knew the "precise or exact nature" of the injuries he would cause (*i.e.*, a subdural hematoma and a subarachnoid hemorrhage), this is not what the prosecutor actually said in closing argument.  Instead, the prosecutor told the jury that the State was not required to prove defendant knew the *extent* of the injuries he would inflict.  This statement was plainly incorrect because the aggravated battery statute requires proof that the defendant knew the extent of the harm he would cause—specifically, *great* bodily harm.  Indeed, the element of "great bodily harm" turns squarely upon the *extent* of the harm inflicted.  The trial court erred by permitting the prosecutor to argue his erroneous understanding of the law to the jury and by prohibiting defense counsel from arguing her correct understanding of the law.  The court's doing so was the functional equivalent of instructing the jury on an erroneous definition of "knowingly."

¶ 54        We further conclude that the trial court's error was not harmless. Defendant's mental state—specifically, whether he knowingly caused great bodily harm to M.W.—was the critical issue of fact in this case. Defendant admitted to detectives that he meant to shake M.W., and he acknowledged that his shaking of M.W. was the cause of her injuries, but he claimed that he did not think his shaking M.W. would cause the injuries that M.W. ultimately suffered. The bulk of the State's case, particularly the medical testimony, was aimed at discrediting defendant's claim that did not knowingly cause M.W.'s injuries. In its closing argument, the State essentially told the jury that it had satisfied the "knowingly" element of aggravated battery by proving that defendant knowingly shook M.W. Defense counsel did not contest this statement in her closing argument because the court had prohibited her from doing so. Because defense counsel—who had been a thorough and vigorous advocate throughout the trial—did not bother to dispute the State's definition of "knowingly," the jury likely concluded that the State's definition must be accurate. Accordingly, we conclude that the State's improper statement regarding the meaning of "knowingly" constituted a material factor in defendant's conviction. See *People v. Wheeler*, 226 Ill. 2d 92, 123, 871 N.E.2d 728, 745 (2007). We therefore reverse and remand for a new trial.

¶ 55        However, because defendant's remaining claims involve issues that are likely to arise again upon retrial, we address the merits of those claims as well.

¶ 56        B. The Lesser-Included-Offense Instruction

¶ 57        Defendant argues that the trial court erred by refusing to instruct the jury on the lesser-included offense of reckless conduct. We agree.

¶ 58        Giving a lesser-included-offense instruction provides an important "third option" to the jury because "[i]f a jury believes that a defendant is guilty of something, but uncertain

whether the charged offense has been proved, the jury might convict the defendant of the lesser offense rather than convict or acquit the defendant of the greater offense." *People v. Ceja*, 204 Ill. 2d 332, 359, 789 N.E.2d 1228, 1246 (2003).

¶ 59        An "included offense" is an offense "established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." 720 ILCS 5/2-9(a) (West 2010). The supreme court, recognizing that this statutory definition "offers little guidance because it does not specify the factors to be considered when deciding whether an uncharged offense is lesser included" (*People v. Kolton*, 219 Ill. 2d 353, 360, 848 N.E.2d 950, 954 (2006)), has identified three possible approaches to determining whether a lesser offense is included in a greater offense: (1) the abstract-elements approach; (2) the charging-instrument approach; and (3) the factual approach. *People v. Miller*, 238 Ill. 2d 161, 166, 938 N.E.2d 498, 501-02 (2010).

¶ 60        If, as in this case, the question is whether an uncharged offense is included in a charged offense, the court should use the charging-instrument approach (*People v. Kennebrew*, 2013 IL 113998, ¶ 32, 990 N.E.2d 197), which the supreme court has explained as follows:

> "Under the charging instrument approach, known as the intermediate approach, the lesser offense need not be a 'necessary' part of the greater offense, but the facts alleged in the charging instrument must contain a broad foundation or main outline of the lesser offense. [Citations.] The indictment need not explicitly state all of the elements of the lesser offense as long as any missing element can be reasonably inferred from the indictment

- 19 -

allegations. [Citation.] There are two steps to the charging instrument approach. First, the court determines whether the offense is a lesser-included offense. Next, the court examines the evidence at trial to determine whether the evidence was sufficient to uphold a conviction on the lesser offense. [Citation.]" (Internal quotation marks omitted.) *Id.* ¶ 30, 990 N.E.2d 197.

¶ 61                                    1. *Charging-Instrument Approach: Step 1*

¶ 62          The first step of the charging-instrument approach—determining whether an uncharged offense is a lesser-included offense of a charged crime—presents an issue of law that we review *de novo. Id.* ¶ 18, 990 N.E.2d 197.

¶ 63          In this case, the trial court found—and the State does not dispute—that reckless conduct was a lesser-included offense of aggravated battery to a child, as charged in the grand jury indictment. We agree. The indictment alleged that defendant "knowingly and without legal justification, cause[d] great bodily harm or permanent disability to M.W., a child two months of age, in that said defendant shook M.W., causing injury to M.W.'s brain." Defendant requested the following pattern jury instruction for the offense of reckless conduct: "A person commits the offense of reckless conduct when he recklessly performs any act which *** causes bodily harm to *** another person." IPI Criminal 4th No. 11.37 (Supp. 2009). Comparing the facts alleged in the indictment with the elements of reckless conduct, it is clear that reckless conduct is a lesser-included offense in this case. The indictment alleged that defendant performed an act (shaking M.W.) that resulted in bodily harm to another person (injury to M.W.'s brain) under a more culpable mental state than the mental state accompanying reckless conduct. See *People v.*

- 20 -

*Willis*, 170 Ill. App. 3d 638, 641, 524 N.E.2d 1259, 1261 (1988) ("Reckless conduct may be a lesser included offense of aggravated battery."); *People v. Roberts*, 265 Ill. App. 3d 400, 402, 638 N.E.2d 359, 361 (1994) (same).

¶ 64                                     2.  *Charging Instrument Approach: Step 2*

¶ 65             Under the second step of the charging instrument approach, we must determine whether the evidence presented at trial was sufficient to uphold a conviction for the lesser-included offense of reckless conduct.

¶ 66             In this case, the trial court refused to instruct the jury on the lesser-included offense of reckless conduct, explaining that "in light of the evidence[,] and particularly the medical evidence in this case[,] and this lack of conflicting evidence, the instruction will not be given."

¶ 67                           a.  The Core Analysis and Standard of Review

¶ 68             The supreme court has repeatedly described the core analysis as follows: the trial court should instruct the jury on a lesser-included offense if the evidence adduced at trial was such that the jury could rationally find the defendant guilty of the lesser offense and acquit him of the greater offense.  *Kennebrew*, 2013 IL 113998, ¶ 27, 990 N.E.2d 197; *People v. Wilmington*, 2013 IL 112938, ¶ 47, 983 N.E.2d 1015; *People v. Medina*, 221 Ill. 2d 394, 405, 851 N.E.2d 1220, 1226 (2006); *Kolton*, 219 Ill. 2d at 360, 848 N.E.2d at 954; *People v. Davis*, 213 Ill. 2d 459, 476, 821 N.E.2d 1154, 1164 (2004); *Ceja*, 204 Ill. 2d at 360, 789 N.E.2d at 1247; *People v. Baldwin*, 199 Ill. 2d 1, 6, 764 N.E.2d 1126, 1129 (2002); *People v. Garcia*, 188 Ill. 2d 265, 284, 721 N.E.2d 574, 584 (1999); *People v. Novak*, 163 Ill. 2d 93, 108, 643 N.E.2d 762, 770 (1994).

¶ 69        However, the State and defendant disagree as to whether (1) the trial court may weigh evidence or assess credibility in making its determination under the core analysis, and (2) the reviewing court should give the trial court any deference in its determination under the core analysis.

¶ 70        The State argues that the abuse-of-discretion standard applies, and this court should defer to the trial court's determination that the evidence did not support an instruction on reckless conduct. See, *e.g.*, *Davis*, 213 Ill. 2d at 475, 821 N.E.2d at 1164 ("This court reviews a court's decision to decline to give an instruction under the abuse of discretion standard."). Defendant, on the other hand, argues that the exercise of discretion plays no part in the determination of whether the evidence rationally supports conviction on the lesser offense and acquittal on the greater offense, and, therefore, *de novo* review applies. See, *e.g.*, *People v. Washington*, 2012 IL 110283, ¶ 19, 962 N.E.2d 902 ("The question of whether sufficient evidence exists in the record to support the giving of a jury instruction is a question of law subject to *de novo* review."). The parties' disagreement over the appropriate analysis and standard of review is understandable.

¶ 71        As the seemingly irreconcilable statements from *Davis* and *Washington* illustrate, the supreme court's case law in this area is in conflict. The supreme court has not been consistent in the way it has described the appropriate standard of review from one case to another. As we discuss in further detail below, some cases have cited prior cases for propositions that those historical cases clearly do not support. And although most cases involving lesser-included offenses have described the same core analysis (*i.e.*, that a lesser-included instruction should be given if the evidence was such that the jury could rationally find

- 22 -

the defendant guilty of the lesser offense and acquit him of the greater offense), the cases have not clearly described the amount of deference—if any—that the reviewing court should lend to the trial court's ultimate determination under that analysis.

¶ 72　　　　In addition, the supreme court has not provided a guiding principle to explain *how* or *why* the type of jury instruction at issue should affect the trial court's or reviewing court's analysis.  If a tendered lesser-mitigated offense instruction in a first degree murder case calls for a different analysis or standard of review than a tendered lesser-included offense instruction in a routine criminal case, or a tendered affirmative defense instruction, what is the basis for that distinction?

¶ 73　　　　The difficulty in drawing a principled distinction between the various analyses and standards of review applicable to different types of jury instructions is best illustrated through examples.

¶ 74　　　　　　　　　　b.  *DiVincenzo* and Related Cases

¶ 75　　　　In this case, both the State and defendant cite *People v. DiVincenzo*, 183 Ill. 2d 239, 700 N.E.2d 981 (1998), a first degree murder case in which the defendant—who caused the victim's death during a weaponless fight—argued on appeal that the trial court erred by refusing to instruct the jury on the lesser-included offense of involuntary manslaughter.  At trial, several eyewitnesses, including the defendant, provided varying accounts of the extent to which the defendant beat the victim.  *Id*. at 244-47, 700 N.E.2d at 985-86.  Testimony conflicted as to whether, or to what extent, the defendant kicked the victim in the head.  *Id.*  The State called medical experts to testify about the severity of the victim's brain injuries.  *Id*. at 247-48, 700 N.E.2d at 986.

- 23 -

¶ 76        The legal issue in *DiVincenzo* is analogous to the legal issue in this case because the greater crimes in both *DiVincenzo* and this case (first degree murder and aggravated battery, respectively) required proof that the defendant acted knowingly, whereas the lesser crimes in both cases (involuntary manslaughter and reckless conduct, respectively) required proof that the defendant acted only recklessly. *Id.* at 249, 700 N.E.2d at 987. The supreme court in *DiVincenzo* described the applicable analysis and standard of review, as follows:

> "[A]n instruction is justified on a lesser offense where there is some evidence to support the giving of the instruction. *People v. Jones*, 175 Ill. 2d 126, 132[, 676 N.E.2d 646, 649] (1997). If there is some credible evidence in the record that would reduce the crime of first degree murder to involuntary manslaughter, an instruction should be given. *People v. Foster*, 119 Ill. 2d 69, 87 [, 518 N.E.2d 82, 89] (1987); *People v. Ward*, 101 Ill. 2d 443, 451[, 463 N.E.2d 696, 699] (1984). Where some evidence supports the instruction, the circuit court's failure to give the instruction constitutes an abuse of discretion. *Jones*, 175 Ill. 2d at 132[, 676 N.E.2d at 649]." *Id.*

¶ 77        In the above passage of *DiVincenzo*, the supreme court cited *Jones*, 175 Ill. 2d at 132, 676 N.E.2d at 649, for the proposition that a trial court abuses its discretion when it fails to issue an instruction on a lesser-included offense if "some evidence" supports the instruction. However, the portion of *Jones* cited in *DiVincenzo* involved an affirmative-defense instruction, not a lesser-included offense instruction. From this, one might naturally conclude that the same

analysis must apply regardless of whether an affirmative-defense or a lesser-included offense is at issue. After all, the supreme court cited the affirmative defense analysis in *Jones* as authority for its lesser-included-offense analysis in *DiVincenzo*. However, this natural conclusion appears to be wrong.

¶ 78 Regarding the affirmative defense instruction at issue in *Jones*, the defendant in that case argued that the jury should have been instructed that it was a defense to the crime of aggravated criminal sexual abuse that the defendant reasonably believed the victim was at least 17 years old. *Jones*, 175 Ill. 2d at 131-32, 676 N.E.2d at 648-49. The *Jones* court held that the evidence required the trial court to give this affirmative defense instruction, explaining that (1) "[v]ery slight evidence upon a given theory of a case will justify the giving of an instruction" and (2) " '[i]n deciding whether to instruct on a certain theory, the court's role is to determine whether there is some evidence supporting that theory; it is not the court's role to weigh the evidence.' " *Id.* at 132, 676 N.E.2d at 649 (quoting *People v. Jones*, 276 Ill. App. 3d 1006, 1012, 659 N.E.2d 415, 420 (1995) (Cook, P.J., dissenting)). These holdings from *Jones*, which the *DiVincenzo* court cited as part of its lesser-included-offense analysis, appear to be fairly straightforward.

¶ 79 However, the *DiVincenzo* court—immediately after citing those holdings from *Jones*—stated that the trial court should give a lesser-included offense instruction if some "*credible* evidence" in the record supports the lesser offense. (Emphasis added.) *DiVincenzo*, 183 Ill. 2d at 249, 700 N.E.2d at 987. Notice the tension between the *Jones* court's prohibition against the trial court weighing the evidence and the *DiVincenzo* court's statement that "credible" evidence should determine whether the trial court should give the tendered jury instruction. Taking *DiVinecnzo* and *Jones* at face value, we are left with two possible explanations. Either

- 25 -

(1) the task of weighing the evidence is meaningfully different than the task of determining credibility or (2) affirmative defenses call for a different analysis than lesser-included offenses.

¶ 80    As a possible third explanation, perhaps we are simply placing too much weight on the *DiVincenzo* court's use of the word "credible" in its opinion.  Maybe the court simply tossed in the word "credible" before the word "evidence" without really intending a credibility determination to make the difference as to whether a lesser-included offense instruction is required.  But if that is true, and the trial court is not actually permitted to consider the weight or credibility of evidence when deciding whether a lesser-included-offense instruction must be given, why does the supreme court routinely remind us of the trial court's "discretion" over giving lesser-included offense instructions?  See, *e.g.*, *Garcia*, 188 Ill. 2d at 283, 721 N.E.2d at 584 ("[W]e consider whether the trial court properly exercised its discretion in submitting the lesser-included offense instruction to the jury.  We observe that the 'abuse of discretion' standard of review must be applied in determining the propriety of the trial court's action."); *People v. Castillo*, 188 Ill. 2d 536, 540, 723 N.E.2d 274, 276 (1999) (in the context of a lesser-included offense instruction, the supreme court noted that "[t]he instruction of the jury is a matter resting within the sound discretion of the trial court"); *Davis*, 213 Ill. 2d at 475, 821 N.E.2d at 1164 (in the context of a lesser-included offense instruction, the supreme court stated, "[t]his court reviews a court's decision to decline to give an instruction under the abuse of discretion standard").  If the analysis does not involve weighing evidence or assessing credibility, what opportunity is there for the trial court to exercise any discretion?  And if no trial court discretion is involved in the determination, where along the deference spectrum should the reviewing court operate?

¶ 81    In further pondering whether the word "credible" in *DiVincenzo* might actually mean something for the trial court's analysis, we should not forget *People v. Everette*, 141 Ill. 2d 147, 565 N.E.2d 1295 (1990), in which the supreme court specifically took note of the adjective "credible" being used to modify the noun "evidence."  In *Everette*, 141 Ill. 2d at 156-57, 565 N.E.2d at 1299, a murder case in which the propriety of a self-defense instruction was at issue, the supreme court specifically noted the following holding from the Seventh Circuit Court of Appeals case of *United States ex rel. Bacon v. DeRobertis*, 728 F.2d 874, 875 (7th Cir. 1984) (*per curiam*): "[P]resumably[,] a trial judge should give a requested jury instruction only if *credible* evidence in the record would support a verdict based on that instruction."  (Emphasis in original.)  The *Everette* court disagreed with the Seventh Circuit's emphasis on *credible* evidence and held that "a homicide defendant is entitled to an instruction on self-defense where there is some evidence in the record which, *if believed by a jury*, would support the defense, even where the defendant testifies he accidentally killed the victim."  (Emphasis added.)  *Everette*, 141 Ill. 2d at 156-57, 565 N.E.2d at 1299.

¶ 82    The *Everette* court's explicit rejection of the "credible evidence" standard in the context of a self-defense instruction makes it more difficult to simply ignore the *DiVincenzo* court's subsequent use of the phrase "credible evidence" in the context of a lesser-included-offense instruction.  See also *People v. Jones*, 219 Ill. 2d 1, 31, 845 N.E.2d 598, 614 (2006) (citing *DiVincenzo*, 183 Ill. 2d at 249, 700 N.E.2d at 987) ("An instruction on a lesser offense is justified when there is some credible evidence to support the giving of the instruction.").

¶ 83    Although one might assume that this tension could be cleared up by looking to the cases that the *DiVincenzo* court cited in support of its "credible evidence" statement, doing so

- 27 -

only adds to the confusion. The *DiVincenzo* court cited its previous decisions in *Foster* and *Ward* for the proposition that a lesser-included-offense instruction should be given if some "credible evidence" appears in the record that would reduce the crime from the greater offense to the lesser offense. *DiVincenzo*, 183 Ill. 2d at 249, 700 N.E.2d at 987. However, the supreme court's opinion in *Foster* never stated that *credible* evidence was required to support the lesser offense. On the contrary, *Foster* stated the exact opposite: "When there is evidence in the record which, *if believed by the jury*, would reduce the crime of murder to manslaughter, an instruction defining the lesser crime should be given." (Emphasis added.) *Foster*, 119 Ill. 2d at 87, 518 N.E.2d at 89.

¶ 84    Further, in *Ward*—as in *DiVincenzo*—the supreme court referred to "credible evidence." However, in support of the "credible evidence" statement in *Ward*, the supreme court cited *People v. Joyner*, 50 Ill. 2d 302, 306, 278 N.E.2d 756, 759 (1972), which used the "if believed by the jury" standard.

¶ 85    This small sampling of the supreme court's jurisprudence on jury instructions illustrates the difficulty we face in attempting to answer two important questions. First, should the trial court refuse to instruct the jury on a lesser-included offense if it finds that the only evidence supporting the lesser offense is insufficiently weighty or credible? Second, if the answer to the first question is yes, to what extent—if any—should the appellate court defer to the trial court's determination?

¶ 86                            c. The Guiding Principle

¶ 87    The tensions and inconsistencies that exist between *Joyner*, *Ward*, *Foster*, *Jones* (1997), *DiVincenzo*, and *Jones* (2006) are not anomalous. They fairly represent the tensions and

inconsistencies that permeate the supreme court's larger jurisprudence concerning the appropriate analysis and standard of review in cases involving jury instructions on lesser-included offenses, lesser-mitigated offenses, theories of the case, and affirmative defenses. To comprehensively catalogue the various points of tension within the enormous body of supreme court case law would be too great of an undertaking for this opinion, and our doing so would not help resolve this case. Instead, we think the best approach is to set aside the conflicting nuances and train our focus, not on the broad category of the instruction at issue in this case (a lesser-included-offense instruction), but on the nature of the specific factual issue that the instruction targets—specifically, defendant's mental state when he committed the acts against M.W.

¶ 88        This brings us back to *Washington*, 2012 IL 110283, ¶ 60, 962 N.E.2d 902, in which the supreme court noted that "[i]t is the jury's function to weigh the evidence, assess the credibility of the witnesses, resolve conflicts in the evidence, and draw reasonable inferences therefrom." This, we conclude, should be the guiding principle in this case. If the trial court's own credibility determination were allowed to stand in the way of the jury's being instructed on a lesser-included offense, the court would be usurping the jury's most basic function. Indeed, at the core of the right to a trial by jury is the understanding that lay jurors might weigh evidence and assess credibility differently than trial judges. However, the "credible evidence" standard—or any standard, for that matter, which purports to give the court "discretion" to decide what the evidence does or does not show—invites the court to substitute its own credibility determination for that of the jury. In so doing, the court short-circuits the defendant's right to have his guilt or innocence on *all* applicable charges determined by a jury of his peers.

¶ 89        Well over a century ago, in a homicide case in which the defendant requested an

- 29 -

instruction on manslaughter, which carried a less culpable mental state than murder, the United States Supreme Court described the trial court's limited role, as follows:

"A judge may be entirely satisfied, from the whole evidence in the case, that the person doing the killing was actuated by malice; that he was not in any such passion as to lower the grade of the crime from murder to manslaughter by reason of any absence of malice; and yet, if there be any evidence fairly tending to bear upon the issue of manslaughter, it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter."

*Stevenson v. United States*, 162 U.S. 313, 323 (1896).

¶ 90        We conclude that the supreme court's references to "credible evidence" in *Ward*, *DiVincenzo*, and *Jones* (2006) do not accurately reflect the limited scope of the trial court's inquiry in determining whether a lesser-included-offense instruction must be given. We note that even in *DiVincenzo*, when the supreme court actually turned to the merits of the case, it seemed to disregard its own "credible evidence" language:

"It is the function of the jury to evaluate the credibility of the witnesses and to make inferences based on the evidence presented. Determination of defendant's mental state may be inferred from the circumstantial evidence [citation], and this task is particularly suited to the jury. Based on the evidence, the jury could reasonably have concluded that defendant, by punching and

- 30 -

kicking the victim, consciously disregarded a substantial and unjustifiable risk of death or great bodily harm but did not have the mental state required for first degree murder." *DiVincenzo*, 183 Ill. 2d at 252, 700 N.E.2d at 988.

This passage from *DiVincenzo* helps frame the issue before us in this case—namely, who should have decided what was actually going through defendant's mind when he shook M.W.? The trial court took it upon itself to make that determination, and in so doing, it intruded upon the province of the jury.

¶ 91       Based upon the evidence presented at trial, we conclude that the trial court abused its discretion by refusing to instruct the jury on the lesser-included offense of reckless conduct. Defendant stated during his police-station interview that he gently shook M.W. to wake her up, or to get her to stop crying, and he did not intend to cause her serious harm. Defendant and both detectives characterized defendant's actions as an "accident." This certainly amounted to "some evidence" that defendant caused M.W.'s injuries recklessly and not knowingly.

¶ 92       The State argues that "[i]n light of the severity of M.W.'s injuries and the amount of force shown to be necessary to create those injuries, there is no evidence to support a conclusion that defendant was merely reckless." We reject this contention. When the State asserts that "no evidence" supported a reckless-conduct instruction, it really means to say that no *credible* evidence supported such an instruction because the medical testimony cast serious doubt over defendant's claim that he did not intend to harm M.W. and that her injuries were an accident. However, that was an issue for the jury to resolve, not the trial court.

¶ 93       As a final note, we acknowledge why a trial court might reasonably believe that it

has discretion to refuse a lesser-included offense-instruction when it concludes that the only evidence supporting such an instruction is insufficiently weighty or credible. The supreme court has repeatedly characterized the giving of jury instructions as a matter resting within the sound discretion of the trial court. The term "sound discretion" usually implies that the court has some limited flexibility to choose the course of action it deems most appropriate based upon the evidence presented. We caution, however, that for all practical purposes, the trial court has no flexibility when it comes to determining whether "some evidence" exists that would allow the jury to rationally find the defendant guilty of the lesser offense and not guilty of the greater offense. Either some evidence supports the lesser offense, or none does. If any such evidence exists, a tendered instruction on the lesser-included offense should be submitted to the jury, regardless of the relative weight or credibility of that evidence.

¶ 94                    C. The Experts' References to "Nonaccidental" Injuries

¶ 95            Last, defendant contends that the trial court erred by permitting the State's medical experts to use the term "non-accidental" to describe M.W.'s injuries. We disagree.

¶ 96            Expert testimony is permitted if the expert's "experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion." *People v. Enis*, 139 Ill. 2d 264, 288, 564 N.E.2d 1155, 1164 (1990). A trial judge is given broad discretion to determine the admissibility of expert testimony. *Id*. at 290, 564 N.E.2d at 1165. In the exercise of that discretion, the court should "carefully consider the necessity and relevance of the expert testimony in light of the facts in the case before [it] prior to admitting it for the jury's consideration." *Id*. The court abuses its discretion only if its rulings are arbitrary, fanciful, or unreasonable. *People v. Lerma*, 2014 IL

- 32 -

App (1st) 121880, ¶ 35, 19 N.E.3d 95.

¶ 97　　　　Defendant contends that Dr. Acakpo Satchivi's and Dr. Trane's testimony that M.W.'s injuries were nonaccidental was more than a mere medical diagnosis of M.W.'s injuries; it was a legal conclusion regarding defendant's mental state.  Defendant claims that the trial court improperly admitted such testimony because the jurors were capable of determining defendant's mental state "using their own common understanding."  Although we agree that describing M.W.'s injuries as "non-accidental" necessarily said something about defendant's mental state—which was the critical issue of fact at trial—we disagree that the State's medical experts improperly used that terminology.

¶ 98　　　　As this court noted in *People v. Owens*, 372 Ill. App. 3d 616, 620, 874 N.E.2d 116, 119 (2007), Illinois courts have rejected the so-called "ultimate fact" doctrine, which held that a witness may not express his opinion as to the ultimate issue in a case.  Instead, "it is now well settled that a witness, whether expert or lay, may provide an opinion on the ultimate issue in a case. [Citation.]  This is so because the trier of fact is not required to accept the witness' conclusion and, therefore, such testimony cannot be said to usurp the province of the jury." *People v. Terrell*, 185 Ill. 2d 467, 496-97, 708 N.E.2d 309, 324 (1998).

¶ 99　　　　In this case, both Acakpo Satchivi and Trane explained to the jury that nonaccidental trauma is generally characterized by a diffuse pattern of injury to the infant's brain, which is unlikely to be caused by a typical accidental injury in which a forcible impact to the head creates a single, focused point of brain injury.  Although many members of the medical community might automatically associate diffuse brain injury with nonaccidental trauma, the same is likely not true of the average lay person.  Had the State's medical experts simply testified

that M.W. had diffuse injuries to her brain, it is unlikely the jurors would have realized the significance of this fact without further explanation.

¶ 100     In terms of the specific vocabulary the State's experts used, it happens that "non-accidental" is a good way for the medical experts to describe injuries that are not consistent with an accidental cause. The record suggests that in the context of this case, the term "non-accidental" is a medical term of art. It is not error to use such terminology in a criminal case simply because the medical experts' interest in accurately describing trauma happens to overlap with the State's interest in proving the *mens rea* element of its case. Accordingly, the trial court did not abuse its discretion by allowing the State's experts to describe M.W.'s injuries as consistent with nonaccidental trauma.

¶ 101     However, defendant also contends that (1) Acakpo Satchivi improperly gave his conclusion as to the circumstances and factual cause of M.W.'s injuries, a conclusion which he based largely upon statements that defendant and third parties made to police during the criminal investigation; and (2) Trane improperly associated M.W.'s injuries with "child abuse." We agree that this testimony from the State's medical experts was improper. As already explained, the State's experts properly testified, based upon their observations of M.W.'s injuries, that those injuries were consistent with what the medical community refers to as "non-accidental" trauma. This testimony was appropriate because medical doctors are in the business of reading the human body and drawing conclusions based upon what they observe. The trial court found the experts qualified to do that, and nothing more.

¶ 102     However, the State did not lay a sufficient foundation for Acakpo Satchivi or Trane to offer expert testimony about *defendant's mental state* or the *actual circumstances* under

- 34 -

which M.W.'s apparently nonaccidental injuries occurred. Such testimony was based upon something other than the doctors' observations of M.W.'s physical injuries. It was therefore outside the scope of the doctors' expertise. The State provided no foundation for Acakpo Satchivi or Trane to testify as experts in the field of parenting behavior, criminal or child-protection investigations, criminal psychology, or any other such field that might require an expert to draw conclusions about a defendant's mental state or the circumstances surrounding a child's nonaccidental injuries. Although expert witnesses may give opinions touching upon the ultimate issue in a case (*Owens*, 372 Ill. App. 3d at 621, 874 N.E.2d at 119), a sufficient foundation must exist to show that the opinion actually derives from the witness's application of his or her expertise.

¶ 103    As a final matter, we commend defendant's trial counsel, Lindsay Evans, for her work in this case. It is clear to us, based upon Ms. Evans' well-developed legal arguments and intricate cross-examination of the State's expert witnesses, that she engaged in exemplary pretrial preparation to become familiar with the pertinent legal and factual issues of trial. Both defendant and the trial court were well served by her efforts.

¶ 104                                III.  CONCLUSION

¶ 105    For the reasons stated, we reverse defendant's conviction and remand for a new trial.

¶ 106    Reversed and remanded.