NOTICE

Decision filed 02/15/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190282-U

NO. 5-19-0282

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 17-CF-126 |
| | ) | |
| RONALD L. PHILLIPS JR., | ) | Honorable |
| | ) | Michael J. Valentine, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Sufficient evidence supported the defendant's conviction for aggravated battery of a child where the evidence was sufficient to prove beyond a reasonable doubt both that the defendant was the person who caused injuries to his seven-month-old son and that he knew his actions were practically certain to cause severe injuries. The court did not overlook mitigating evidence or abuse its discretion in sentencing the defendant.

¶ 2    The defendant, Ronald L. Phillips Jr., was convicted of aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)). The charge stemmed from an incident in which his seven-month-old son sustained severe neurological injuries as a result of being shaken. On appeal, the defendant argues that (1) the evidence was insufficient to prove beyond a reasonable doubt that he was the person who shook the baby and caused his injuries, (2) there was insufficient evidence to

1

prove that the defendant knew his actions were practically certain to cause these injuries, and (3) the court overlooked two statutory factors in mitigation in sentencing him. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The events at issue in this case occurred on March 31, 2017. Although the precise timing was disputed, most of what occurred was not. The defendant was home caring for his son, K.P., while his girlfriend, Treva Miller, was at work. The defendant's five-year-old daughter, H.P., arrived home from school at 3:30 that afternoon. At that time, seven-month-old K.P. was crying. Sometime between 4:30 and 5 p.m., the defendant brought K.P. to the office of his pediatrician, Dr. Neeta Kaushal, who was out of the office handling an emergency at the time. K.P. was seen by Neeta Kaushal's husband and medical partner, Dr. Bhuvneesh "Johnny" Kaushal, who told the defendant to take the baby to the emergency room immediately. Although there was some dispute as to the precise sequence of events that occurred, medical records indicate that K.P. arrived at the emergency room of Good Samaritan Hospital at 6:39 that evening. The nurse practitioner who examined the baby determined that he was experiencing serious neurological problems, and the baby was air-lifted to Cardinal-Glennon Hospital in St. Louis. It was ultimately determined that K.P.'s injuries were the result of "shaken baby syndrome."

¶ 5     The defendant was charged with one count of aggravated battery of a child, and the matter came to trial in September 2018. Ashley Smith testified for the State that she and her husband, Travis, visited the defendant and Treva at their home early on the afternoon of March 31, 2017. They were there so Smith's husband could purchase marijuana from the defendant or Treva, but they visited for a while, and Smith played with the baby. She stated that the baby seemed fine when she played with him.

¶ 6    Smith further testified that she and Travis started to feel uncomfortable because the defendant and Treva "were arguing, something to do with, um, puppies or she thought he had hurt a puppy or done something." The Smiths therefore left. Smith testified that she saw Treva Miller's vehicle pulling out behind them as they left.

¶ 7    Smith acknowledged that she was subsequently charged with a methamphetamine charge, for which she received "first offender" probation. She noted that she gave a statement to police in this case before that arrest.

¶ 8    On cross-examination, Smith was asked whether she had been smoking marijuana or using methamphetamine at any time during the 24 hours before her visit to the defendant's home that day. She replied, "Yes." On redirect examination, Smith explained that she was a recovering addict, and that, in March of 2017, she was often high. However, she could not specifically recall what she might have taken that day or when she might have taken it. When asked if she remembered the events described in her testimony, Smith replied, "Yes."

¶ 9    Dr. Johnny Kaushal testified that he saw K.P. briefly late in the afternoon of March 31, 2017. He noted that it was shortly before the office closed for the day, sometime between 4:30 and 5 p.m. He explained that K.P. was his wife's patient; however, her nurse asked him to see a patient who did not "look okay." Dr. Kaushal testified that when he saw the baby, he was drowsy and moaning. He told the father to bring the baby to the emergency room for immediate attention. Dr. Kaushal noted that Good Samaritan Hospital was very close to his office. On cross-examination, Dr. Kaushal testified that his entire interaction with K.P. and his father lasted three to five minutes.

¶ 10    The State also presented the testimony of Nicole Tripp, who described herself as a "longtime friend" of the defendant. Tripp testified that she and her husband visited the defendant at his home late in the afternoon of March 31, 2017. Although she did not recall the precise time,

3

she noted that it was still light out. She testified that when she arrived, K.P. was lying on the couch. The defendant told her that the baby had been constipated and was not feeling well. The defendant also told Tripp that he had just come from seeing the pediatrician and was about to take him to the emergency room, but that he had just stopped at home to pack a diaper bag for the baby. Tripp testified that when she saw K.P., his eyes were closed, and he looked discolored. She stated that she touched the baby's foot, but the baby did not respond. She estimated that she was at the defendant's home for 10 minutes.

¶ 11    Catherine Durbin is the nurse practitioner who treated K.P. at the emergency room of Good Samaritan Hospital. She testified that the triage board indicated that he was a seven-month-old baby with constipation and fussiness. She saw him at 7 p.m. She estimated that he had arrived approximately 15 minutes earlier.

¶ 12    When Durbin entered the examination room, K.P. was whimpering. Both parents were present, and the father was holding the baby. The parents told Durbin that the baby had not had a bowel movement for three days. They told her that he finally did have a bowel movement at around 3:30 that afternoon, at which time he "became very fussy, irritable." She explained that this made no sense to her because having a bowel movement after being unable to do so should have made the baby feel better. However, she testified that nothing in her physical examination of the baby was inconsistent with the parents' report that he had been experiencing constipation.

¶ 13    After getting a history from the baby's parents, Durbin examined him. She first checked his breathing and his heart rate. She explained that she did these things first because she was able to listen to his heart and lungs with her stethoscope while he was still being held by his father. Durbin testified that K.P.'s breathing was normal, but his heart rate was "a little bit fast."

4

¶ 14    Durbin testified that the baby was then placed on a stretcher so she could examine him further. She noticed that his head tilted to the right side and that his eyes looked constantly to the right. She explained that this was called "conjugate gaze," something often seen in adult stroke patients. She further explained that the patient's eyes look in the direction of the brain bleed. Durbin testified that when she tested K.P.'s reflexes, he responded on the right side, but did not respond on the left. Durbin explained to the baby's parents that he was experiencing a "major neurological problem." She testified that she asked a physician who was on duty to look at the baby as well. He was then flown to Cardinal-Glennon Hospital in St. Louis for diagnosis and treatment.

¶ 15    The State's next witness was K.P.'s sister, H.P. She was five years old when the events at issue transpired, and she was seven years old when she testified at trial. The prosecutor began by asking H.P. why she was in court that day. Initially, H.P. said she did not know. When asked if she was there because she saw something, however, H.P. said, "Yeah." The prosecutor then asked, "Can you tell me what you saw?" H.P. replied, "Um, he shook my Bubby." She explained that "Bubby" is what she called her brother, K.P. Although H.P. was not able to give specific information about when she saw her father shake her baby brother, she testified that when she came home from school, her brother was crying.

¶ 16    The prosecutor then asked H.P. to demonstrate with a baby doll what she saw her father do. H.P. stated that she did not remember how many times he did it. Then she demonstrated using the doll. The prosecutor described her actions for the record, noting that she placed her hands underneath the doll's shoulders. However, the attorneys disagreed on whether to describe the motion she made with the doll as straight up and down or a 45-degree angle. The trial judge stated that, to him, it looked like H.P. was moving the doll up and down, but "a little diagonal."

5

¶ 17    On cross-examination, defense counsel attempted to ask H.P. about her statement to police. When asked whether she described the shaking she saw as soft, hard, or "in between," she could not remember what she had said. Counsel then asked, "Well, I mean, what would you say now? How would you describe it? Hard or soft or in between?" H.P. replied, "I think in between." Later, the detective who interviewed H.P. testified that during the interview, she described the shaking as "soft."

¶ 18    Detective Scott Burge was the lead investigator on this case. He testified that the case was assigned to him on April 3, 2017. He and Vanessa Shaw, an investigator from the Department of Children and Family Services, conducted a video-recorded interview with the defendant at approximately 8:15 that evening. A recording of that interview was admitted into evidence and played for the jury.

¶ 19    At the beginning of the interview, the defendant told Detective Burge and Shaw that K.P. had a history of constipation, something he inherited from his mother, Treva. He also told them that Treva had a history of seizures and that she was undergoing treatment for postpartum depression, including medication and therapy. The defendant then noted that his daughter, H.P., has two older brothers who sometimes pick on her and that she "might be acting up" because she is jealous of K.P. needing attention.

¶ 20    In describing the events of the day K.P. was injured, the defendant stated that Treva left for work at 1:40 p.m. and H.P. came home from school at 3:30 p.m. The defendant needed to use the restroom, so he told H.P. to leave K.P. in his walker. While he was in the restroom, he heard the baby scream and cry. When he came out, he saw H.P. cradling her baby brother on the sofa. According to the defendant, he asked her what happened, but she would not tell him. He thought that maybe the baby's foot got caught when H.P. tried to lift him out.

6

¶ 21 The defendant then told Detective Burge and Shaw that he and Treva exchanged text messages about K.P.'s constipation. He explained that Treva got in touch with their pediatrician, Dr. Kaushal, and then called him to tell him to bring K.P. to Dr. Kaushal's office. (We note that this is consistent with the testimony of Neeta Kaushal's nurse.) The defendant estimated that he brought K.P. to Dr. Kaushal's office at around 4 p.m. She was not in the office, but her staff and her husband, who is also a doctor, told him to bring the baby to the emergency room.

¶ 22 Initially, the defendant stated that he called Treva and told her to meet him at the emergency room. He stated that he stopped to drop H.P. off with her mother, Danielle Buck, and then drove directly to the emergency room. However, he changed his story when Shaw began questioning him about the timing of these events. When asked what time he thought he arrived at the emergency room, the defendant hesitated before saying, "Five, five-thirty." Shaw then asked whether Treva met him at the emergency room or at home. The defendant replied, "Okay. She met me at the house. I told her on my way to meet me there. She said, 'Oh, I'm on my way home.' " He went on to explain that he stopped at the house to pick up Treva and get a diaper bag, then he took H.P. to her mother's house, and then went to the emergency room.

¶ 23 Detective Burge next asked the defendant what happened when they got to the emergency room. The defendant stated that K.P. had a seizure. He then noted that about a month earlier, he noticed K.P. stretching his arms forward and tensing them. He also noticed K.P. grabbing his head. (We note that the defendant demonstrated these behaviors rather than describing them.) It is not entirely clear whether the defendant meant that this occurred once or more than once. When asked if Treva saw this happen, the defendant said, "Yes." When asked if they brought K.P. to see a doctor, the defendant said, "No." He explained that when he discussed it with Treva, she insisted that she did not believe he had inherited a seizure disorder from her.

7

¶ 24    Detective Burge steered the topic of conversation back to what occurred in the emergency room. Here, the defendant gave a description of K.P.'s condition that was consistent with that given by Catherine Durbin in her testimony.

¶ 25    The defendant then told Detective Burge and Shaw that a few months earlier, Treva had dropped K.P. on the sofa during a heated argument with the defendant's mother. He noted, however, that Treva took him to the emergency room after that incident and was told that the baby was fine. Without prompting, he stated that Treva had a "violent history."

¶ 26    Detective Burge next asked the defendant if anyone had been at his house that day. The defendant said no one had been there. When asked a second time whether anyone had come to his house, the defendant again said no, but indicated that his mother came over later.

¶ 27    At this point, Detective Burge told the defendant that he knew the defendant was not telling him the truth. He stated, "I know there were people there." When asked again who had been at his house, the defendant said that a friend named Jeff Weaver came over to bring him some parts for his car. Detective Burge revealed that he knew that Ashley, Travis, Nicki, and Nick were at his house that day. The defendant denied this.

¶ 28    Detective Burge then told the defendant that the doctors treating his baby needed to know whether he had been shaken side-to-side or back-and-forth in order to know what treatment to provide. He stated that the baby's doctors had told him that K.P.'s injuries could not have been caused by H.P. and that the police knew it had to have been the defendant because he was the only other person there. The defendant claimed that the doctors had told him it could have been up to 24 hours earlier, when Treva was also with the baby. He then asked, "Are you sure it wasn't Treva setting me up?"

8

¶ 29　Detective Burge responded by informing the defendant that he and Shaw had interviewed H.P., and that she told them what happened. The defendant hung his head in his hands and began to cry. However, he continued to deny shaking the baby.

¶ 30　Throughout the remainder of the interview, the defendant denied multiple times that he shook his son. At one point, he suggested that H.P. told them he had shaken the baby because she had been brainwashed to say that by her mother, Danielle, who was angry at the defendant. He also suggested that H.P. may have seen him moving the baby up and down gently in play. He demonstrated this with a baby doll that H.P. had used to demonstrate what she saw him do. At one point, the defendant said, "Treva did it. She has issues. She has issues. She needs help. I told her that so many times."

¶ 31　Detective Burge testified that, after interviewing the defendant, he obtained a search warrant for phone and text records. When asked if there were text messages that he found significant to his investigation, Detective Burge noted that there were a few texts in which the defendant gave Treva alternative explanations for K.P.'s injury. In one, he told her that K.P. had been straining to have a bowel movement. In another, he told her that H.P. was jealous of the baby and wrote, "I don't blame her, I blame myself." Detective Burge also noted that although the defendant blamed Treva during the interview, he did not accuse her of harming the baby in his text messages to her. Finally, Detective Burge testified that Good Samaritan Hospital's records established that the defendant arrived at the emergency room with K.P. at 6:39 p.m., not at 5 or 5:30 as the defendant stated during the interview.

¶ 32　On cross-examination, Detective Burge explained that he focused his investigation on the defendant because K.P.'s treating physician, Dr. Linda Shaw, told him that the injury occurred "within close proximity of the time of the child showing symptoms," and the defendant was the

9

only adult present with the baby during this time. He acknowledged that he did not ask any other doctors their opinions on the window of time in which the injuries could have occurred before the onset of symptoms. When asked whether H.P. described the shaking as hard or soft, he testified that she described it as soft.

¶ 33    Copies of the text logs obtained by Detective Burge were entered into evidence. Although we need not discuss them in detail, we note that between 1:42 and 3:28 p.m. on the date of the incident, the defendant and Treva exchanged several text messages in which it appears that they were not angry with each other and did not suspect that anything was wrong with K.P. At 4:59 p.m., the defendant sent Treva a series of three texts telling her to call him and that he had to go to the emergency room because "[t]hey don't think it's constipation." At 5:14 p.m., the defendant again sent Treva a text saying he had to go to the emergency room. At 5:51 p.m., he sent her a text asking if she wanted him to meet her at work. The following day, the defendant sent Treva multiple text messages in which he provided alternative explanations for K.P.'s injuries, suggesting that he may have "busted a blood vessel" while straining to defecate; that H.P. may have accidentally shaken him; or that H.P. may have "acted out," either out of jealousy or because her two older brothers were mean to her.

¶ 34    Dr. Linda Shaw testified for the State. She is an expert in child abuse pediatrics and was one of K.P.'s treating physicians at Cardinal-Glennon. Dr. Shaw opined that K.P.'s injuries were inflicted through abuse. She testified that he had a severe brain bleed and hemorrhaging at the back of his retinas, but he did not have any fractures, bruises, or other outward injuries. She explained that these injuries were indicative of "acceleration—deceleration," meaning that he was likely shaken or slammed into a soft surface. She further opined that the baby was "very likely" injured

10

that afternoon. She reached this conclusion because there was no evidence of repeated vomiting, sleepiness, or any other symptoms earlier in the day.

¶ 35    The defense presented only one witness, Dr. Marcus DeGraw. He, too, specializes in child abuse pediatrics. In preparation for his testimony, Dr. DeGraw reviewed K.P.'s medical records. He noted that images of K.P.'s brain revealed an older brain bleed on one side of his head and a newer brain bleed on the other side. Dr. DeGraw agreed with Dr. Shaw's conclusion that the injuries were caused by acceleration—deceleration, or "shaken baby syndrome." However, he opined that the injury could have occurred earlier. Initially, he stated that by looking at the images, he could determine, based on what the blood looks like, that the injuries were likely inflicted "within the previous several days at most." He ultimately opined, however, that the injury likely occurred within 24 to 48 hours before "presentation," meaning the time K.P. arrived for treatment.

¶ 36    When asked to explain why he could not narrow the time frame further, Dr. DeGraw explained that symptoms do not always manifest immediately. He noted that in babies, it can be difficult to recognize some of the earliest symptoms. He explained that early, mild symptoms might seem like the baby is fussy. In addition, because babies are not yet walking or talking, the loss of function that accompanies a brain injury may not be apparent immediately.

¶ 37    The jury found the defendant guilty. The court ordered a presentence investigation report, which indicated that the defendant had a 2004 misdemeanor conviction for driving with a suspended license, two tickets for playing loud music, and six traffic tickets. He had no felony convictions.

¶ 38    The court held a sentencing hearing on March 27, 2019. The State presented two witnesses in aggravation—K.P.'s foster mother and the foster care case manager overseeing his case. Both testified about the lasting impact of the injuries K.P. sustained. Their testimony established that

11

K.P. remained hospitalized for nearly three months. At the time of the sentencing hearing, K.P.'s motor skill development on his left side lagged behind the right, but he was able to get around fairly well wearing a leg brace on his left leg. K.P. had to undergo one-hour sessions of speech therapy, physical therapy, developmental therapy, and occupational therapy once a week and an additional physical therapy session once a month. He still had a shunt in his brain to allow fluid to drain.

¶ 39    K.P.'s foster father read a victim impact statement into the record. He provided additional comments regarding K.P.'s condition when he was first released from the hospital. He explained that even though K.P. was then 10 months old, his foster parents fed him formula using nipples designed for three- to six-month-old babies. To help him swallow properly, they had to pause his feedings and gently massage his throat. They also needed to use a specialized highchair and a specialized stroller to keep the baby upright because the muscles on the left side of his body did not work properly. Finally, he noted that, while K.P. was doing much better by the time of the hearing, his development was still delayed by four to six months, and he still struggled with motor skills on the left side of his body.

¶ 40    As evidence in mitigation, the defendant presented the testimony of Rodney Mellott, who was formerly his youth pastor. Mellott testified that the defendant had been active in his church's youth group. He stated that the defendant often helped the younger kids in the youth group. Mellott also saw the defendant periodically as an adult, including a few times when the defendant helped with building and remodeling projects. Asked to describe the defendant's demeanor, Mellott said that he was "calm" and "level-headed" and that he never saw him angry. Mellott further testified that any time he saw the defendant with his children, he appeared to be "a very good parent, very

loving and just very attentive to their needs." However, he acknowledged that he only saw the defendant with K.P. "a few times for a few hours at a time" when they attended church.

¶ 41 The defendant offered a statement in allocution. He thanked K.P.'s foster parents for taking care of his son. He then stated that after his relationship with Danielle Buck ended, he took care of their daughter, H.P., and Danielle's two sons on his own. Finally, he stated that he saved the life of a fellow inmate who tried to hang himself. We note, however, that he did not testify to any of this under oath.

¶ 42 The State urged the court to impose a sentence of 25 to 30 years, arguing that the seriousness of the offense, the need to protect the community, and the need to deter others were the most important factors for the court to consider. The prosecutor stated, "I'm also aware that Mr. Phillips doesn't have criminal history, to speak of, but the seriousness of this offense really says all that—that you need to know about his ability to inflict harm on those in the community because the offense [was] committed against the most vulnerable member of the community." He emphasized that the defendant did not take responsibility for his actions, instead trying to blame others for what happened to K.P. As such, the prosecutor argued, the defendant had little rehabilitative potential in spite of his limited criminal history.

¶ 43 Defense counsel asked the court to impose a sentence near the lower end of the statutory range. He argued that two statutory factors in mitigation were present—the defendant had no history of criminality of delinquency or had led a law-abiding life for a significant period of time (see 730 ILCS 5/5-5-3.1(a)(7) (West 2016)) and the character and attitudes of the defendant indicated that he was unlikely to reoffend (see *id.* § 5-5-3.1(a)(9)). In support of his contention that the second factor was applicable, counsel asked the court to consider both the testimony of Rodney Mellott and the defendant's demeanor in court. He argued that the court should not hold against

13

the defendant the fact that he continued to maintain his innocence, something he had a constitutional right to do.

¶ 44   In ruling from the bench, the court found that two statutory factors in aggravation were applicable—the need to deter others (see *id.* § 5-5-3.2(a)(7)) and the fact that the defendant held a position of trust or supervision (see *id.* § 5-5-3.2(a)(14)). The court then stated, "As far as the history of prior delinquency or criminal activity, I find that the defendant, while not having any prior violent criminal convictions, does have a Class A misdemeanor conviction and the traffic petty offenses listed in the Pre-Sentence Investigation." The court found no factors in mitigation to be present and sentenced the defendant to 28 years in prison.

¶ 45   The defendant filed a motion to reconsider sentence, arguing that the court should reconsider its finding with respect to the defendant's lack of criminal history. That motion came for a hearing on June 26, 2019. In urging the court to reconsider its earlier finding, defense counsel emphasized that the defendant had only one charge "that even rises to the level of a Class A misdemeanor," which was a 2004 charge for driving on a suspended license. After that, his only charges involved speeding tickets or tickets for playing loud music. Counsel asked the court to reduce the defendant's sentence to 20 years.

¶ 46   In ruling from the bench, the court stated that it considered the pertinent statutory factor in mitigation (*id.* § 5-5-3.1(a)(7)), and that "[t]he court made its finding with regard to that subparagraph 7, considering the criminal history, including the petties." The court then stated as follows:

"And the court has and did consider that, but more importantly, the court considered the injuries to the child in this case, the fact that there were severe injuries, hospitalization

14

required, therapy required. The foster parents testified, and there were stents—I believe they were called—that needed to be put into the child to help with drainage." The court noted that K.P.'s injuries were likely to be permanent, and explained that the seriousness of the offense was "the main reason or thrust behind [the] sentence." The court therefore denied the defendant's motion. This appeal followed.

¶ 47                                II. ANALYSIS

¶ 48                          A. Sufficiency of the Evidence

¶ 49    The defendant first argues that the evidence was insufficient to support his conviction because (1) there was insufficient evidence to prove beyond a reasonable doubt that he was the individual who inflicted K.P.'s injuries and (2) assuming the evidence was sufficient to prove he was the perpetrator, the evidence was not sufficient to prove beyond a reasonable doubt that he knew that his actions were practically certain to cause the injuries. We reject both contentions.

¶ 50    In addition to proving each element of the offense beyond a reasonable doubt, the State must also prove beyond a reasonable doubt that the defendant was the person who committed the crime. *People v. Slim*, 127 Ill. 2d 302, 307 (1989). When a defendant challenges the sufficiency of the evidence on appeal, the question for this court is whether the evidence was sufficient for any reasonable trier of fact to find the essential elements of the offense beyond a reasonable doubt. In making this determination, we must view the evidence in the light most favorable to the prosecution. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). We must also draw all reasonable inferences from the evidence in favor of the prosecution. *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007).

¶ 51    It is not the role of this court to resolve conflicts in the evidence or to determine the credibility of the witnesses. *Collins*, 106 Ill. 2d at 261-62. We recognize that the jurors had the

15

opportunity to see and hear the witnesses as they testified, and that, as such, they were in a better position than we are to assess the credibility of those witnesses. *Wheeler*, 226 Ill. 2d at 114-15. We therefore give great deference to the jury's credibility determinations. *Id.* at 115. We will only reverse a conviction if the evidence is so improbable, unreasonable, or unsatisfactory that it raises a reasonable doubt as to the defendant's guilt. *Id.*; *Collins*, 106 Ill. 2d at 261.

¶ 52                    1. *Evidence That the Defendant Shook K.P.*

¶ 53    The defendant first argues that the evidence was insufficient to prove beyond a reasonable doubt that he was the person who shook K.P. and caused his injuries. We disagree.

¶ 54    The crux of the defendant's argument is that the evidence showed that the child's mother, Treva Miller, also had the opportunity to injure K.P. during the applicable time frame. There are two components to this argument. First, the defendant argues that Ashley Smith's testimony that nothing appeared to be wrong with the baby when she visited the house was "suspect" because she admitted to using marijuana and/or methamphetamine at some point during the 24 hours before she saw K.P. and because her testimony that the defendant and Treva were arguing was contradicted by other evidence in the record. He notes that although Smith testified that their argument had something to do with a puppy, there was no evidence that the defendant had a puppy or had access to a puppy. He also points to the text message log, which shows that he and Treva exchanged text messages that were not angry in nature just after Smith and her husband left. Second, the defendant argues that, even accepting Smith's testimony, his expert witness, Dr. Marcus DeGraw, testified that the baby could have been injured anywhere up to 48 hours before the time he presented with symptoms. We are not persuaded.

¶ 55    We reject both components of the defendant's argument for the same reason: as we stated previously, we give great deference to the jury's credibility determinations because the jury had

16

the opportunity to observe the witnesses as they testified. *Wheeler*, 226 Ill. 2d at 114-15. The jury was entitled to accept Dr. Shaw's opinion testimony over that of Dr. DeGraw on the question of when the injury could have occurred. See *People v. Lind*, 307 Ill. App. 3d 727, 736 (1999) (explaining that conflicting expert testimony does not require a finding of insufficient evidence because jurors "may either accept or reject an expert's conclusion"). The jury was likewise entitled to find Smith's testimony credible. It is worth noting that Smith was never specifically asked whether she was high when she visited the defendant that day. More importantly, however, the jury's determination that she was credible when she stated that she remembered the events she described in her testimony was entitled to deference. See *Wheeler*, 226 Ill. 2d at 115. Viewing this evidence in the light most favorable to the prosecution, as we must (see *Collins*, 106 Ill. 2d at 261), we believe it was sufficient to allow a reasonable jury to find that the defendant was the only person who had access to K.P. when he was injured (see *Lind*, 307 Ill. App. 3d at 736 (noting that the victim sustained her fatal injuries "when she was alone with [the] defendant" in rejecting the defendant's challenge to the sufficiency of the evidence)).

¶ 56    In addition, the jury saw a video recording of the defendant's interview with police, during which he changed his story multiple times, and the jury heard evidence that the defendant did not bring K.P. to the emergency room until 6:39 p.m. after being advised to do so immediately. This evidence demonstrates an awareness of guilt. As such, it provides further support for the jury's conclusion that the defendant was the person who shook K.P. and caused his injuries.

¶ 57    Finally, the jury also heard H.P.'s testimony that she saw her father shake her brother. We recognize that H.P.'s testimony, standing alone, might not have been adequate. As the defendant emphasizes, H.P. was unable to specify when she saw her father shake the baby, and she described the shaking as "soft" or "in between" hard and soft. However, we find that the totality of the

17

evidence we have discussed corroborated H.P.'s testimony. We conclude that, taken together, the evidence was sufficient to prove beyond a reasonable doubt that the defendant was the person who shook K.P. and caused his injuries.

¶ 58                    2. *Evidence of the Defendant's Knowledge*

¶ 59    The defendant next argues that the State failed to prove beyond a reasonable doubt that he knew his actions were practically certain to cause great bodily harm to K.P., as is required to sustain a conviction for aggravated battery of a child as charged. We disagree.

¶ 60    The State was required to prove that the defendant "knowingly" caused "great bodily harm or permanent disability or disfigurement" to a child under the age of 13. 720 ILCS 5/12-3.05(b)(1) (West 2016). This required the State to prove that the defendant was "consciously aware" that his conduct was "practically certain" to cause great bodily harm or permanent disability or disfigurement to K.P. *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992); see also 720 ILCS 5/4-5(b) (West 2016). Although the State was not required to prove that the defendant knew the precise nature of the injuries his conduct was likely to cause, it was required to prove that he "knew the extent of the harm he would cause—specifically, great bodily harm." (Emphasis omitted.) *People v. Willett*, 2015 IL App (4th) 130702, ¶ 53.

¶ 61    Because knowledge is a mental state, it must ordinarily be proven through circumstantial evidence, as the defendant acknowledges. *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 20. Here, relevant circumstantial evidence included the testimony of two expert witnesses that K.P.'s injuries were consistent with "shaken baby syndrome" and were too severe to have been caused by a five-year-old sibling. Rational jurors could infer from this evidence that the "defendant *must have known* of the substantial probability of causing" great bodily harm "based on the severity of violence necessary to cause the injuries." (Emphasis in original.) *People v. Rader*, 272 Ill. App. 3d

18

796, 804-05 (1995). Also pertinent was the great disparity in size between the defendant, a grown man who was 6 feet 2 inches tall and weighed 200 pounds, and K.P., a seven-month-old infant. See *Lind*, 307 Ill. App. 3d at 736; *Rader*, 272 Ill. App. 3d at 805. Finally, jurors could also consider the fact that the defendant gave conflicting versions of what happened, all of which were inconsistent with the injuries K.P. suffered. See *Lind*, 307 Ill. App. 3d at 736; *Rader*, 272 Ill. App. 3d at 805. We conclude that this evidence was sufficient to allow a rational jury to find that the defendant knew his conduct was practically certain to cause great bodily harm to K.P.

¶ 62     The defendant's argument to the contrary relies heavily on evidence he contends supports his theory that he did not violently shake K.P. He points to Detective Burge's testimony that H.P. described the defendant's shaking of the baby as "soft" when she was interviewed. He also contends that when H.P. demonstrated what she saw in court, "she lifted the doll up and down and diagonally, not in a violent manner." The defendant argues that "[n]o one would expect that routine lifting up and down of an infant would lead to severe head injuries." We are not persuaded.

¶ 63     We first note that, although the court stated after H.P.'s demonstration that "from the court's point of view, the doll was moving up and down, a little bit of a diagonal," the record does not indicate how hard she was moving the doll. In addition, H.P. specifically used the word "shook" when describing what she saw. Considering this testimony in conjunction with the other evidence we have already discussed at length, we do not believe that a rational jury was required to find that all the defendant did was engage in the "routine lifting up and down of an infant." Rather, we conclude that a rational jury could find beyond a reasonable doubt that the defendant shook the baby in a manner that he knew was practically certain to cause great bodily harm. We therefore reject the defendant's claim that the evidence was insufficient to prove that he had the requisite knowledge.

19

¶ 64                                    B. Sentencing

¶ 65     The defendant next argues that the court abused its discretion in sentencing by failing to consider two relevant factors in mitigation. Specifically, he contends that the court should have found that the defendant had no criminal history or had led a law-abiding life for a substantial period of time (730 ILCS 5/5-5-3.1(a)(7) (West 2016)), and that the circumstances under which the crime occurred were unlikely to recur (*id.* § 5-5-3.1(a)(8)). We reject his contention.

¶ 66     Sentencing decisions must be made based on a consideration of the particular facts and circumstances of the case, including the defendant's criminal history, the defendant's rehabilitative potential, "and the recognized interest in protecting the public and providing a deterrent." *People v. Winchester*, 2016 IL App (4th) 140781, ¶ 71. The sentence chosen must reflect both the seriousness of the offense and the objective of restoring the defendant to useful citizenship. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 22. Determining the appropriate sentence to impose "is a matter involving judicial discretion." *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 30. We review a trial court's sentencing decision "with great deference." *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. We will not disturb its decision absent an abuse of discretion even if we might have weighed the relevant factors differently. *Busse*, 2016 IL App (1st) 142941, ¶ 20.

¶ 67     In spite of this broad discretion, however, trial courts "*must* consider all relevant factors in mitigation." (Emphasis in original.) *Weiser*, 2013 IL App (5th) 120055, ¶ 31. Absent an affirmative indication to the contrary in the record, we may presume that the court considered any mitigating evidence placed before it. *Busse*, 2016 IL App (1st) 142941, ¶ 23. We will also presume that the court properly evaluated all relevant factors in mitigation absent some affirmative evidence to the contrary. *Id.* ¶ 22.

¶ 68    Here, as stated previously, the defendant contends that the trial court overlooked two factors in mitigation at sentencing. First, he challenges the court's decision not to find that he had no criminal history or had led a law-abiding life for a substantial time before the commission of the offense at issue. See 730 ILCS 5/5-5-3.1(a)(7) (West 2016). Earlier, we set forth in detail the parties' arguments concerning the significance of this factor as well as the court's findings on the matter. As we discussed then, the State acknowledged that the defendant did not have a significant criminal history but argued that this should not be given much weight in the face of evidence that, according to the State, indicated the defendant had little rehabilitative potential. The record indicates that the court carefully considered the nature of the defendant's prior offenses. The court even referred to them as "petty." Considering both the number of prior petty offenses (nine) and the other evidence weighing against a finding that the defendant's limited history established rehabilitative potential, we find no abuse of the court's discretion. See, *e.g.*, *Busse*, 2016 IL App (1st) 142941, ¶ 25; *Weiser*, 2013 IL App (5th) 120055, ¶¶ 12, 34.

¶ 69    The defendant next contends that the court overlooked a relevant mitigating factor by failing to find that his conduct was the result of circumstances unlikely to recur. 730 ILCS 5/5-5-3.1(a)(8) (West 2016). As he acknowledges, however, the record contains little evidence of the circumstances surrounding the offense aside from H.P.'s testimony that the baby was crying when she got home from school that day. He nevertheless argues that because he has no history of violent crimes, nothing in "his background indicated that he had a problem with violence, or anger management, or would in any way be violent toward anyone." As such, he contends, "the situation was extremely unusual and unique *** and *** unlikely to recur." We note that this sentencing factor ordinarily refers to unusual circumstances beyond a defendant's control that are unlikely to recur, such as provocation. See, *e.g.*, *People v. Calhoun*, 404 Ill. App. 3d 362, 388 (2010) (noting

21

that the trial court failed to recognize that in light of circumstances that created provocation, the defendant was unlikely to reoffend); *People v. Burnette*, 325 Ill. App. 3d 792, 808 (2001) (rejecting a defendant's argument that the trial court failed to consider whether strong provocation of a burglary constituted a circumstance unlikely to recur because nothing in the record indicated that the court failed to consider it). The defendant does not point to any such circumstances in this case, much less any evidence that they existed.

¶ 70    We further note that, while trial counsel did not argue at sentencing that this particular sentencing factor was applicable, he relied, in part, on the same evidence of the defendant's background in support of a different mitigating factor—that the character and attitudes of the defendant indicated that he was unlikely to reoffend. See 730 ILCS 5/5-5-3.1(a)(9) (West 2016). The court did not find that factor to be applicable, a finding the defendant did not challenge in his motion to reconsider sentence and does not challenge in this appeal. In any case, viewing the record as a whole, we do not believe the court was required to find either that the defendant's character and attitudes indicated that he was unlikely to reoffend or that his conduct was the result of unknown circumstances that were unlikely to recur.

¶ 71    Finally, we note that the court expressly stated on the record that the seriousness of the offense was the primary reason for the sentence imposed. Although the court is required to consider mitigating factors, it is not required to give them more weight than it gives the seriousness of the offense. *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001). Indeed, the seriousness of the offense is the most important factor to consider. *Busse*, 2016 IL App (1st) 142941, ¶ 28; *Weiser*, 2013 IL App (5th) 120055, ¶ 32. We find no abuse of discretion.

¶ 72                                III. CONCLUSION

¶ 73    For the foregoing reasons, we affirm the defendant's convictions and sentences.

22

¶ 74    Affirmed.