NOTICE

Decision filed 01/16/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220533-U

NO. 5-22-0533

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jefferson County. |
| | ) | |
| v. | ) | No. 17-CF-167 |
| | ) | |
| TYRONE STEELE, | ) | Honorable |
| | ) | Jerry E. Crisel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    There was sufficient evidence to prove the defendant's guilt beyond a reasonable doubt, both that he committed the offense and that he knew his actions would cause great bodily harm. The circuit court did not err when it allowed testimony of previous acts of domestic violence committed by the defendant. The circuit court did not abuse its discretion when it sentenced the defendant, as the circuit court properly considered all relevant aggravating and mitigating factors.

¶ 2    Following a bench trial, the defendant, Tyrone Steele, was convicted of aggravated battery of a child, a Class X felony. 720 ILCS 5/12-3.05(b)(1) (West 2016). The defendant was sentenced to 20 years in the Illinois Department of Corrections, to be served at 85% with 3 years' mandatory supervised release. The defendant appeals his conviction based on a claim that the State failed to prove the defendant guilty beyond a reasonable doubt where his conviction rested largely on circumstantial evidence that failed to produce a reasonable certainty that the defendant and no one else caused the injuries, and that he knew his actions were practically certain to cause great bodily

1

harm. The defendant also argues that the circuit court abused its discretion by allowing the State to introduce evidence regarding two prior acts of domestic violence that were not factually similar to the acts alleged in the case at bar and therefore were substantially more prejudicial than probative. Lastly, the defendant claims the circuit court abused its discretion in sentencing the defendant because it refused to consider the defendant's age at the time of the offense and other significant factors in mitigation. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                I. BACKGROUND

¶ 4      L.S. was born on December 12, 2016, to his parents, the defendant and Abagail Adkins. On April 20, 2017, Adkins and a caseworker from Lutheran Child Family Service took L.S. to Cardinal Glennon Children's Hospital (Cardinal Glennon) in St. Louis, Missouri, for a follow-up appointment. L.S. had previously been in the intensive care unit (ICU) for complications as a result of having been 12 weeks premature. Upon his discharge, L.S. required follow-up visits. Adkins was the defendant's girlfriend at the time, and they were living together, caring for L.S. Lutheran Child Family Service had become involved with the family based upon reports made to the Department of Children and Family Services (DCFS) of medical neglect.

¶ 5      At the follow-up appointment, medical staff noticed that L.S. had an enlarged head. Consequently, the doctors obtained an ultrasound and a CT scan to determine its cause. After reviewing the test results, the doctors were concerned that there was bleeding between L.S.'s brain and skull, which could be a sign of trauma and possible abuse. Dr. Timothy Kutz, the director of the Child Protection Division at Cardinal Glennon, who primarily evaluates and cares for children who have suffered neglect, sexual abuse, and physical abuse, was contacted. L.S. was admitted to the hospital for more tests to evaluate his condition and the bleeding between his skull and brain.

2

An MRI and x-rays were taken to assess the bleeding and L.S., generally. The x-rays revealed 14 rib fractures involving 12 different ribs and a skull fracture on the right side of L.S.'s skull. There was also an injury to the frontal lobe of L.S.'s brain, which is the part of the brain right behind the forehead and above the eye sockets. This second brain injury was to the nerve tissue that connects the left and right side of the brain, known as the corpus callosum. An eye specialist also looked at L.S.'s eyes and noted that there was some intraretinal hemorrhaging, which is bleeding inside the retina.

¶ 6    After further investigation, the defendant and Adkins were both charged by information on May 11, 2017, with aggravated battery of a child. The defendant and Adkins were both subsequently indicted for aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) (West 2016)) on May 30, 2017.

¶ 7    The joint bench trial of the defendant and Adkins began on September 24, 2018, where Dr. Kutz testified. The State introduced L.S.'s medical records from Cardinal Glennon. Dr. Kutz testified regarding his employment at Cardinal Glennon and his certification by the American Board of Pediatrics for General Pediatrics and for Child Abuse Pediatrics. The circuit court found Dr. Kutz to be an expert in the fields of general pediatrics and child abuse pediatrics. Dr. Kutz then testified about the totality of L.S.'s injuries and the role he played in L.S.'s care.

¶ 8    Relying on L.S.'s medical records, Dr. Kutz gave a summary of L.S.'s admission to the ICU when he was born. L.S. spent five weeks in the ICU at St. Mary's Hospital after he was born and was transferred to Cardinal Glennon because he was not breathing around the time of feedings. L.S. remained in the ICU at Cardinal Glennon for four weeks. None of the injuries observed at the follow-up appointment were present when L.S. was discharged from Cardinal Glennon's ICU.

3

¶ 9     Ultimately, Dr. Kutz opined that the injuries suffered by L.S. were from abuse. The basis of Dr. Kutz's opinion was the unexplained nature of the skull fracture and the brain bleed. Also, both the injuries to the brain and the occurrence of multiple rib fractures were indicators of abusive trauma in young infants. The brain injury that was evident between the left and the right side of the brain is a specific kind of injury and represents fairly significant trauma. Dr. Kutz stated that L.S. could not have sustained the brain injury on his own, "someone had to help them do that." The posterior rib fractures were also significant. Posterior rib fractures are typically caused by forcefully grabbing the child by the chest, forcing him away in an accelerating fashion, and bringing the child back in a decelerating fashion.

¶ 10    Dr. Kutz spoke with Adkins at the hospital to gather information about her pregnancy, birth, and the progress of L.S. over the past four months. Originally, Adkins provided two explanations as to how L.S. had received his injuries. First, Adkins explained that L.S. had rolled off the couch. Second, L.S. had bumped his head on the side of his crib. In his opinion, Dr. Kutz opined that L.S. could not have received any of his injuries from falling off the couch.

¶ 11    Law enforcement and DCFS made Dr. Kutz aware of three more explanations given by the defendant and Adkins during their investigation: a suffocation event, CPR, and a time when L.S. may have been thrown against a crib mattress. Dr. Kutz used the phrase "suffocation event" because he did not know the method or manner in which the suffocation was performed. Dr. Kutz gave his opinion on the different explanations offered. A suffocation event could have caused the injuries, depending on how the trauma occurred. If a pillow or a hand was placed over L.S.'s mouth, he would not have been injured. However, if suffocation occurred by pressing hard on L.S.'s chest or by squeezing him against an adult chest, this may have caused the lateral rib fractures or fractures out to the side. Dr. Kutz explained that if the chest is compressed, because it

4

is round or oval, most of the forces are experienced by the side of the ribs. As a result, it is more likely to cause fractures on the side. Due to the number of rib fractures, Dr. Kutz said that it was unlikely that the lateral rib fractures were caused by CPR. In his opinion, suffocation would not have caused the posterior rib fractures, skull fracture, or brain injury. Dr. Kutz also testified that L.S. had four posterior rib fractures. In order to cause posterior rib fractures, the rib had to move in relation to the spine. Dr. Kutz could not imagine a way in which CPR would cause a posterior rib fracture.

¶ 12    Dr. Kutz testified on cross-examination that the type of accelerating and decelerating action he described can occur when throwing a child or shaking the child. More specific to L.S.'s history, Dr. Kutz said, "if you have a child in front of you and you throw them forcefully in a direction, at the time you're pushing them away, you're accelerating the child. At the time they hit something, like a crib mattress, they are now slowing down rapidly, so that's deceleration."

¶ 13    Further on cross-examination, Dr. Kutz testified about L.S.'s enlarged head. Prior to his return to the hospital, L.S.'s head size was noted to be below average, but still within normal range. When L.S. was admitted to the hospital in April, L.S. was at the very top range of normal, exceeding the normal growth chart. Then Dr. Kutz discussed the collection of blood in L.S.'s brain, as discovered in the CT and MRI. As an example, Dr. Kutz indicated that if a child is dropped accidentally and he hits his head, if bleeding occurs, it is likely that the bleeding will be right under where the impact happened. Dr. Kutz further explained that if there is bleeding that covers the whole surface of the brain or an entire section of the brain, it is more concerning than a small area. Here, L.S. had bleeding on both the left and right side of the brain, as well as on the top of the brain. Dr. Kutz testified that if there is significant trauma to someone's brain, the frontal cortex is prone to be injured in the way L.S. was injured. Also, with significant trauma, like accelerating

5

and decelerating rapidly, or shaking, modeling illustrates that the area that is most prone to injury is the area where L.S. was injured, in the corpus callosum.

¶ 14     The defense attorney asked Dr. Kutz if there was any possible way that CPR could cause the posterior fractures. Dr. Kutz replied that if someone performed CPR against a cornered surface, like the corner of a wall, that could cause the fractures. CPR performed in that manner would be incredibly incorrect, and he did not believe that anyone is trained to perform CPR against the corner of a wall.

¶ 15     Dr. Kutz also testified on cross-examination that the injuries to L.S. appeared outside the realm of accidental because of the significant trauma suffered by L.S. Dr. Kutz did not have an explanation that would have explained an accidental cause for the injuries in light of the significant trauma.

¶ 16     At the conclusion of the testimony by Dr. Kutz, the defendant's case was severed from Adkins's trial. The defendant's bench trial resumed on October 11, 2018. Jeff McElroy was the first witness to testify on that date. McElroy is the child protection investigator with DCFS that was assigned to L.S.'s case on April 3, 2017. McElroy became involved in the case due to an allegation of medical neglect because L.S. was missing doctor's appointments at Cardinal Glennon and L.S. was not wearing the heart monitor to measure L.S.'s breathing, as prescribed. On April 3, 2017, McElroy went to the apartment of the defendant and Adkins. McElroy spoke with the defendant because he was the only person home at the time. McElroy informed the defendant about the investigation and discussed issues that may have impacted L.S.'s care. The defendant told McElroy about a physical altercation between the defendant and Adkins. The defendant said that he and Adkins were having a conversation and when she started to leave the house, he pulled her back inside to talk to her. This event occurred while Adkins was trying to leave the house with

6

L.S. and his aunt. Before McElroy left, he told the defendant that L.S. needed to be seen as soon as possible and that McElroy would return the following morning.

¶ 17   McElroy arrived at the apartment the next morning and spoke with Adkins and the defendant. They told McElroy that they would only use the heart monitor in the evening because that is the only time they felt like L.S. needed it. L.S. was sleeping at the time of McElroy's visit, so he observed the baby and made sure that he was breathing.

¶ 18   When McElroy got back to his office, there had been a hotline report of domestic violence between the defendant and Adkins the previous day. Before McElroy could meet with the defendant and Adkins about the hotline report, another hotline report was made for medical neglect for failure to use the monitor appropriately. After this report, another DCFS worker also became involved and discovered through Cardinal Glennon that this was a high-risk situation. After about a week, L.S. missed another appointment at Cardinal Glennon. At that point, Cardinal Glennon wanted to see L.S. immediately. The following day, April 20, 2017, Adkins and a caseworker took L.S. to Cardinal Glennon.

¶ 19   McElroy was informed about the injuries discovered at Cardinal Glennon. In response to that information, McElroy contacted the Mt. Vernon Police Department. Detective Haney was assigned to the case. McElroy and Detective Haney traveled to St. Louis to speak to Dr. Kutz. Dr. Kutz explained that he believed that L.S. had been abused.

¶ 20   The Southern Illinois Death Task Force was activated and conducted a forensic evaluation of the apartment. While the evaluation of the apartment was completed, McElroy and Detective Haney spoke with the defendant at the Mt. Vernon Police Department. During the interview, the defendant said that L.S. had rolled off the couch. The defendant also said that he gave CPR to L.S. at some point because he had stopped breathing. L.S. was not taken to see a doctor after the

7

defendant performed CPR. The defendant never indicated that someone other than he or Adkins had taken care of L.S.

¶ 21    Adkins, who was also charged with aggravated battery of a child, testified for the State. The circuit court admonished Adkins regarding her right to remain silent, which she waived. Adkins testified that she and the defendant had been in a relationship since December 2015. Adkins discovered she was pregnant in June 2016. Adkins explained that while she and the defendant were initially shocked by the pregnancy, they were happy about the news. Adkins testified that later, during an argument through Facebook, the defendant said that he did not want to have a baby with Adkins. During the same argument, the defendant threatened to take Adkins to court to have an abortion.

¶ 22    The State then asked Adkins if the defendant had ever been physically abusive towards her. Adkins first described an event that occurred when the defendant's aunt, Bobbi Damron, came to pick Adkins up to go to the public aid office. The defendant and Adkins were arguing while Adkins was getting L.S. into his car seat. When Adkins took L.S. outside to meet Damron, the defendant followed. Once outside, the defendant pushed Adkins and she fell to the ground. Adkins also said that when she was five months pregnant with L.S. and "showing," the defendant knocked her down.

¶ 23    Adkins then testified about interactions the defendant had with L.S. Sometime in March 2017, there was an incident between the defendant and L.S. The defendant told Adkins that a bottle hit L.S. in the head and caused a knot in the center of his forehead. Adkins thought the defendant told her that he had thrown the bottle, but she was not certain that was what was said. The State asked if Adkins had seen the defendant mishandle L.S. Adkins said that one day L.S. threw up on the defendant and the defendant "put" L.S. over the couch. Upon further questioning, Adkins

admitted that she had previously stated that the defendant had "slung" L.S. over the couch, but that she did not know that slung meant thrown. On four or five occasions, the defendant pressed on L.S.'s chest when he was crying to soothe him. Adkins admitted that during an interview with Detective Haney she informed Detective Haney that the defendant had covered L.S.'s face with a pillow until he turned blue. Despite what she originally told Detective Haney, Adkins retracted her statement and testified that that the incident did not happen. Adkins also told Detective Haney that the defendant did not want L.S. to cry because he did not want L.S. to be a "punk" or a "cry baby." During Adkins's testimony, she tried to explain that the defendant was concerned about the future, not while L.S. was a baby. After the meeting with Detective Haney, Adkins wrote a letter to the State's Attorney Featherstun to tell him that everything Adkins had told Detective Haney was false. The letter denying her prior statements to Featherstun was admitted into evidence during cross-examination.

¶ 24 Adkins then testified that when L.S. was originally discharged from Cardinal Glennon, there were still medical concerns. L.S. still had reflux and was required to wear a heart monitor. In March 2017, L.S. stopped breathing twice. The defendant performed CPR on L.S. as the defendant had been taught to do so at the hospital. Neither time L.S. stopped breathing was he taken to the hospital or was a doctor contacted.

¶ 25 During cross-examination, Adkins testified that pressing on L.S.'s chest was a soothing technique. Adkins stated that no one saw L.S. fall off the couch, but he was on the couch and then he was on the floor, crying. Adkins provided context about the last interview she had with Detective Haney. Adkins also testified that she told Detective Haney when the defendant would press on L.S.'s chest he would push as hard as he could. Adkins had just been incarcerated, she was emotional, and her father told her if she said that someone else hurt L.S. she would get to go

9

home. On redirect, Adkins admitted that she initiated the last interview with Detective Haney, which was the interview that she recanted in the letter to Featherstun.

¶ 26    Darla Adkins, Abagail Adkins's mother, also testified. Darla stated that she saw L.S. a few times in the hospital after he was born, while L.S. was in the ICU before she was told not to come anymore because she was too opinionated. Once L.S. was out of the hospital, Darla saw L.S. two or three times. In April, on Darla's third visit to see L.S., she noticed that L.S. did not look well and his arm was twitching. After Darla left, she called DCFS because she thought something was wrong.

¶ 27    Chrissi Rendleman was an Adkins family friend and a resident of the same apartment complex as Adkins and the defendant. Rendleman testified about some interactions she had with Adkins and the defendant before L.S. was born. Rendleman told Adkins that if she wanted to continue to receive any assistance from Rendleman, Adkins would need to stand up for herself and not allow the defendant to be mean to her. Rendleman believed that Adkins told the defendant about that conversation because she subsequently received text messages from the defendant telling her to mind her own business and calling her names. The day following the receipt of the text messages, Rendleman went to Adkins's apartment. When Rendleman spoke with Adkins, Adkins said that the defendant did not want to have a baby with her. Sometime after that conversation, the defendant confronted Rendleman by putting his nose to her cheek and calling her names. Rendleman called the police that night.

¶ 28    Bobbi Damron, the defendant's aunt, testified regarding the incident she witnessed in April 2017 when she came to the apartment to take Adkins to the public aid office. As Adkins was placing L.S. in the car, the defendant came out of the house and got in a fight with Adkins. The defendant and Adkins were wrestling and then Damron saw the defendant swing at Adkins.

10

Damron got out of the driver's seat and went around the van and found Adkins on the ground with her hands above her head. Damron broke up the fight and told the defendant that "he was not going to do that especially with the baby there." Damron testified on cross-examination that although she saw the defendant swing at Adkins, Damron did not see the defendant strike Adkins. On further redirect, Damron testified that after the fight, the defendant took the car seat and L.S. back inside the house. L.S. remained in the house briefly before the defendant returned L.S. to the van so Damron and Adkins could go to the public aid office.

¶ 29    The State admitted and published two video recordings of the defendant being interviewed. The first video was the interview conducted on April 22, 2017, by Detective Haney and McElroy. The second interview was on May 5, 2017, by Detective Haney and another officer. The trial judge took the exhibits under advisement to view after the testimony had been completed.

¶ 30    Detective Haney then testified about his role in the investigation. Detective Haney became involved in the case on April 21, 2017, after he was notified that there was a baby at Cardinal Glennon with injuries consistent with domestic battery. Detective Haney contacted McElroy at DCFS, and they traveled to Cardinal Glennon to speak with Adkins. The only explanation Adkins gave for the injuries was that L.S. fell off the couch. After speaking with Adkins, Detective Haney and McElroy spoke with Dr. Kutz. Detective Haney then obtained a search warrant for the defendant's apartment.

¶ 31    While the search warrant was being executed, Detective Haney and McElroy interviewed the defendant. During the interview, the defendant confirmed that only he and Adkins cared for L.S. The defendant said that he did not know how L.S. was injured, but the defendant did offer a few explanations: L.S. had rolled off the couch, the defendant performed CPR on L.S., and the defendant claimed the injuries could have been caused by hospital staff treating L.S. The defendant

11

admitted to a couple of incidents of domestic battery, including once when he pushed Adkins down and grabbed her hair.

¶ 32    On May 5, 2017, the defendant was interviewed by Detective Haney for a second time. The interview was similar to the first interview, except the defendant accepted the fact that L.S.'s injuries were consistent with child abuse. The defendant again asserted that the hospital staff caused the injuries. However, the defendant stated that if anyone should "go down for it," it may as well be him. Both the defendant and Adkins were taken into custody. An interview with Adkins was later conducted on May 15, 2017. During this interview, Adkins implicated the defendant in multiple instances of violence towards L.S. This concluded the State's case.

¶ 33    The defense presented two witnesses, Whitney Davis and Sebastian Whipple. Davis and Whipple were friends of the defendant for approximately four years. Both testified that they visited the defendant several times a week after L.S. was born, and neither saw the defendant act inappropriately towards L.S.

¶ 34    The case then proceeded to closing arguments. The prosecutor argued that Adkins's prior inconsistent statements made to Detective Haney were admissible as substantive evidence. During Adkins's testimony at trial, she acknowledged that she had made prior inconsistent statements to Detective Haney, which the State argued was required for the prior inconsistent statements to be used as substantive evidence. The State explained the discrepancies and why they were important to the State's case. In response, the defense argued that the State did not lay the proper foundation for Adkins's statements to be admitted as substantive evidence. The defense continued by arguing the State had the burden to establish the time, date, and the place of the prior inconsistent statements. The State replied that the evidence presented made it clear that the statements were made on May 15, 2017, at the jail during the third interview with Detective Haney. In a judgment

12

order, the circuit court ruled that Adkins's statements were substantive evidence. At the conclusion of all the arguments, the circuit court found the defendant guilty of aggravated battery of a child.

¶ 35    At sentencing, the State published the interview with Adkins and Detective Haney taken on May 15, 2017, when she implicated the defendant in prior abuse of L.S. Jordan Spetter, a Jefferson County Sheriff's Office employee, also testified for the State regarding an interaction he had with the defendant. Specifically, when Spetter transported the defendant and Adkins from the courthouse to the Jefferson County Justice Center, the defendant masturbated in the back of his squad car. Kaitlyn Jett, L.S.'s current caseworker from Lutheran Child and Family Services, also testified. Jett stated that L.S. has a speech delay but was otherwise doing well.

¶ 36    The State argued that the main factor in aggravation was to deter others from committing the same crime as the defendant. In addition, the State argued that the circuit court should consider the unique harm inflicted on L.S. and how that harm was inflicted. The totality of L.S.'s injuries "should weigh the heaviest on the Court today." The defense argued that the defendant did not have a prior criminal history and that this criminal conduct was the result of circumstances unlikely to recur. In support of its argument, the defense cited the defendant's youth and that the defendant's parental rights were likely to be terminated.

¶ 37    The defendant also gave a statement in allocution. The defendant apologized for everything that happened to L.S., including the injuries L.S. endured. The defendant expressed how much he loved L.S. He never wanted L.S. to grow up without his mother and father. An apology was extended to Adkins's parents for having watched L.S. suffer and because their daughter was sent to prison. Then the defendant said how grateful he was to Darla Adkins, Adkins's mother, for being kind to him and caring for L.S. The defendant spoke about his difficult childhood. He was abused and taken from his mother when he was young. As a result, he lived in various group

13

homes. Afterwards, the defendant apologized to Adkins for their "bumpy relationship" and the fact that she did not get to experience being a mother to her first-born child. The defendant stated that he was not an angry young man, and he has a lot of potential to do great in life. To conclude, the defendant said that he was happy that L.S. was a healthy and happy boy now.

¶ 38   Victim impact statements from L.S.'s maternal grandparents were presented to the court. Rick Adkins, L.S.'s grandfather, was not present, so his statement was read by Chrissi Rendleman. Rick wrote that L.S. suffers from night terrors and being left alone. Rick was angry that this happened to L.S., an innocent child. Also, he was upset that he may never see his daughter again, and L.S. may never know his mother. Rick was saddened that he and his ex-wife, Darla Adkins, lost the opportunity to be grandparents. Darla was present and delivered her statement. Darla explained that after she learned about the injuries to L.S., her life was turned upside down. Darla spent time away from her own children when L.S. was in the hospital. She then dedicated more time to L.S. to take him to speech and occupational therapy. Darla felt robbed of her opportunity to be a grandmother. She was also upset that her daughter would not have the chance to see L.S. grow up.

¶ 39   In sentencing, the circuit court considered the factors in aggravation that the sentence was necessary to deter others from committing the same crime. Another aggravating factor was the age and the helplessness of L.S. and the extent of the injuries suffered by L.S. The last aggravating factor contemplated by the circuit court was that the defendant was L.S.'s father and he had a duty to protect his child. The circuit court found that the lack of criminal history was a factor in mitigation. The circuit court stated that the defendant's age was not a defense and would not give it much consideration. The defendant was sentenced to 20 years in the Illinois Department of Corrections with 3 years' mandatory supervised release.

14

¶ 40    A motion to reconsider sentence was filed on April 5, 2019. The defendant requested the court reconsider the weight given to the factors in mitigation, specifically the defendant's age and lack of criminal history. A hearing on the motion was not held until August 16, 2022. At the hearing, the new defense counsel adopted the arguments made in the motion to reconsider sentence previously filed, and reasserted the arguments made at sentencing. The State asked that the motion to reconsider sentence be denied. The circuit court did not find that the age of the defendant was a factor in mitigation, and the motion to reconsider was denied. This appeal followed.

¶ 41                                   II. ANALYSIS

¶ 42    Before this court, the defendant argues three different issues. First, the defendant argues that the State has failed to prove that he is guilty beyond a reasonable doubt. Second, the defendant claims that the circuit court erred when it allowed testimony of previous acts of domestic violence committed by the defendant because the acts were not factually similar to the offense charged and were more prejudicial than probative. Third, the defendant believes that the circuit court abused its discretion in sentencing the defendant because it refused to consider the defendant's age and other mitigating factors, which would show his rehabilitative potential.

¶ 43                         A. Guilt Beyond a Reasonable Doubt

¶ 44                              1. *Sufficiency of the Evidence*

¶ 45    The defendant claims that his conviction was almost entirely based on circumstantial evidence, which is far from conclusively leading to reasonable certainty that the defendant committed the crime to the exclusion of anyone else. The defendant posits that the evidence at best established that he had the opportunity to commit the crime because he was one of L.S.'s primary caretakers. The State submits that the evidence unquestionably demonstrates that the defendant abused L.S. and caused the injuries.

15

¶ 46    When a defendant challenges the sufficiency of the evidence after he has been found guilty of an offense, "a reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original and internal quotation marks omitted.) *People v. Klein*, 2015 IL App (3d) 130052, ¶ 97 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). To set aside a criminal conviction on appeal, the evidence must be "so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." *Klein*, 2015 IL App (3d) 130052, ¶ 97. The credibility determination of witnesses, the weight given to witness testimony, and the reasonable inferences drawn from the evidence presented is the responsibility of the fact finder. *Klein*, 2015 IL App (3d) 130052, ¶ 97. We will not fulfill the responsibilities of the fact finder and retry the defendant. *Klein*, 2015 IL App (3d) 130052, ¶ 97. Circumstantial evidence is sufficient to sustain a conviction, "if all the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 47    The defendant argues that the evidence was insufficient because opportunity alone is not sufficient to find the defendant guilty and Adkins's testimony was incredible. Viewing the evidence in the light most favorable to the State, the defendant had acted violently towards Adkins while Adkins was pregnant with L.S. and in the presence of L.S. after he was born. The defendant did not want to have a child with Adkins. While L.S. was originally admitted to the ICU, the defendant did not spend a significant amount of time with him. Once L.S. was discharged from the hospital, the defendant did not ensure L.S. attended his follow-up doctor's appointments. The defendant was particularly disturbed by L.S.'s crying. The defendant told Adkins that he did not want his child to be a "punk" or a "cry baby." During Adkins's third interview with Detective

16

Haney, Adkins disclosed events where the defendant hurt L.S. These events included the following: (1) the defendant threw a bottle and it hit L.S. in the head causing a knot on his forehead, (2) the defendant "slung" L.S. over the side of the couch, (3) the defendant would press hard on L.S.'s chest to stop L.S. from crying, and (4) the defendant placed a pillow over L.S.'s face, which caused L.S. to turn blue. Dr. Kutz testified that some of the rib fractures could have been caused by someone pressing hard on L.S.'s chest or by squeezing him against an adult chest. Suffocation or pressing hard on L.S.'s chest would not have caused the remaining posterior rib fractures, skull fracture, or the brain injury. Dr. Kutz concluded that L.S.'s injuries were caused by abuse. The defendant and Adkins were L.S.'s primary caretakers and no other person or persons could have inflicted the injuries upon L.S. No evidence was produced that Adkins injured L.S.

¶ 48     The defendant argues that Adkins was completely incredible because she gave two consistent statements to investigators before her third interview that the State relies on as an inconsistent statement. Adkins retracted her third statement to Detective Haney and testified consistent with her first two statements. Clearly, the circuit court, as the trier of fact, believed that Adkins's third statement to Detective Haney was the most credible. We will not substitute our judgment for the trier of fact regarding the weight of the evidence or the credibility of witnesses.

¶ 49     The defendant continues by arguing that the State did not prove that the defendant was responsible for L.S.'s injuries. The defendant relies primarily on *People v. Dowaliby*, 221 Ill. App. 3d 788 (1991), for this argument. In *Dowaliby*, the defendant was convicted for the murder of his daughter. *Dowaliby*, 221 Ill. App. 3d 788. The State's argument in *Dowaliby* was based on the defendant's "opportunity to murder Jaclyn, his behavior and statements, and the identification of David's nose structure and the Dawaliby's [car]." *Dowaliby*, 221 Ill. App. 3d at 797. The defendant and his wife were the only people believed to have the opportunity to murder their daughter.

17

*Dowaliby*, 221 Ill. App. 3d at 798. On appeal, the court stated that "[o]pportunity alone, however, is not sufficient to sustain a conviction unless the State can prove beyond a reasonable doubt that no one else had the opportunity to commit the crime." *Dowaliby*, 221 Ill. App. 3d at 797. Here, the circumstances are different because the circuit court did not rely on opportunity alone. There was significant circumstantial evidence before the circuit court, as detailed above. Opportunity was merely one of the pieces of circumstantial evidence considered by the circuit court. We conclude that the totality of the evidence was sufficient to prove beyond a reasonable doubt that the defendant was the person who caused the injuries to L.S.

¶ 50                                    2. *Knowingly*

¶ 51    To be found guilty of aggravated battery of a child, the State must prove that the defendant "knowingly" caused "great bodily harm" to a child under the age of 13. 720 ILCS 5/12-3.05(b)(1) (West 2016). A defendant has knowingly caused great bodily harm when the defendant was " 'consciously aware that his conduct [was] practically certain to cause great bodily harm.' " *People v. Willett*, 2015 IL App (4th) 130702, ¶ 51 (quoting *People v. Psichalinos*, 229 Ill. App. 3d 1058, 1067 (1992)). Further, a defendant must know the extent to which his conduct would cause harm, specifically that his conduct would cause "great bodily harm." *Willett*, 2015 IL App (4th) 130702, ¶ 53.

¶ 52    A defendant does not need to admit that he acted knowingly for the knowledge element to be satisfied. *People v. Lind*, 307 Ill. App. 3d 727, 735 (1999). "Knowledge is ordinarily established by circumstantial evidence, rather than by direct proof." *Lind*, 307 Ill. App. 3d at 735. There is a presumption that the defendant intended the probable consequences of his actions. *People v. Rader*, 272 Ill. App. 3d 796, 803 (1995). "[G]reat disparity in size and strength between the defendant and the victim, as well as the nature of the injuries, may be considered in this context."

18

*Rader*, 272 Ill. App. 3d at 803. Again, we will review the evidence regarding the knowledge element in the light most favorable to the State, and if any rational trier of fact could have found the element beyond a reasonable doubt. *Rader*, 272 Ill. App. 3d at 804. We "will not set aside a criminal conviction 'unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt.' " *Lind*, 307 Ill. App. 3d at 736 (quoting *People v. Beverly*, 278 Ill. App. 3d 794, 798 (1996)).

¶ 53    The defendant argues that the State did not offer any evidence to show that the defendant knew his actions were practically certain to cause great bodily harm to L.S. The defendant told Detective Haney that he performed CPR on L.S. Adkins testified that the defendant would push on L.S.'s chest to soothe him. She also testified about an incident where the defendant hit L.S. in the head with a bottle. The defendant argues that the State did not offer any evidence that the defendant knew that his actions would cause great bodily injury. Also, the defendant claims that no one would expect that throwing a bottle would cause a skull fracture and injury to the brain. Lastly, the defendant argues that no one could say precisely when, or how, L.S. was injured.

¶ 54    The State requests that we reject the defendant's argument because Dr. Kutz's testimony established that L.S.'s injuries were not caused accidentally but were caused by abuse. Dr. Kutz also testified that CPR could not have caused all the rib fractures sustained by L.S. The State also relies on Adkins's testimony that the defendant squeezed L.S. as hard as he could, and that given those circumstances, anyone would be practically certain they would cause great bodily harm. In support of its argument, the State cites *People v. Phillips*, 2022 IL App (5th) 190282-U, a similar case in which the defendant was convicted of aggravated battery of a child. The defendant's argument on appeal was that there was insufficient evidence that he shook the baby causing his injuries and that there was insufficient evidence that the defendant knew his actions were

19

practically certain to cause the baby's injuries. We affirmed the circuit court's decision in *Phillips* as there was sufficient evidence to support the conviction.

¶ 55　　We find the analysis in *Phillips* persuasive. Here, Dr. Kutz found that the injuries suffered by L.S. were not accidental, self-inflicted, or the result of CPR alone, but rather consistent with child abuse. A rational trier of fact could infer that the defendant must have known of the substantial probability of causing great bodily harm "based on the severity of violence necessary to cause the injuries." *Rader*, 272 Ill. App. 3d at 805. The great size disparity between the defendant and L.S. is important. *Phillips*, 2022 IL App (5th) 190282-U, ¶ 61; *Lind*, 307 Ill. App. 3d at 736; *Rader*, 272 Ill. App. 3d at 805. L.S. was born 12 weeks premature and was only 4 months old when the injuries were discovered, whereas the defendant was an adult man. Lastly, the trier of fact may consider that the defendant gave varying explanations of how L.S. was injured, which failed to explain all of L.S.'s injuries. *Phillips*, 2022 IL App (5th) 190282-U, ¶ 61; *Lind*, 307 Ill. App. 3d at 736; *Rader*, 272 Ill. App. 3d at 805. We conclude that there was sufficient evidence to allow a rational trier of fact to find that the defendant knew his conduct was practically certain to cause great bodily harm to L.S.

¶ 56　　　　　　　　　　B. Other-Crimes Evidence—Domestic Violence

¶ 57　　The State filed a motion *in limine*, which it later amended, seeking to admit prior instances of domestic violence for evidence of motive or intent pursuant to section 115-7.4 of the Code of Criminal procedure of 1963 (725 ILCS 5/115-7.4 (West 2016)). A hearing was held on the amended motion *in limine*, and the circuit court admitted three occurrences of prior domestic violence. The defendant now challenges two of the circuit court's admissions. The first instance of domestic violence occurred when Damron came to pick up Adkins to go to the public aid office. The defendant followed Adkins outside to Damron's van after an argument. As Adkins was trying

20

to secure L.S. into the van, the defendant pushed Adkins to the ground and swung at her. The circuit court allowed this altercation because L.S. was present and near the incident. The second act of domestic violence that was allowed happened when Adkins was five months pregnant, and the defendant knocked Adkins to the ground. The circuit court allowed this occurrence, on the condition that the State establish that Adkins was visibly pregnant, or the defendant knew she was pregnant at the time he knocked Adkins down.

¶ 58    The defendant argues that the circuit court erred by admitting evidence of these two incidents of domestic violence. The defendant objected to this evidence at the motion *in limine* hearing, but he did not include this claim in his motion for new trial. In criminal cases, it has been "held consistently that a defendant preserves an issue for review by (1) raising it in either a motion *in limine* or a contemporaneous trial objection, and (2) including it in the posttrial motion." *People v. Denson*, 2014 IL 116231, ¶ 11. "Failure to preserve an error results in forfeiture." *People v. Schoonover*, 2021 IL 124832, ¶ 22. The defendant failed to include this issue in his posttrial motion. As a result, we conclude the defendant has forfeited his claim.

¶ 59    The defendant requests in the alternative that this issue be reviewed for plain error. The defendant argues that these incidents do not resemble the crime alleged in this case, so their admission was vastly more prejudicial than probative. For this argument the defendant cites *People v. Smith*, which provides "[a]s factual dissimilarities increase [between the charged offense and the other-crimes evidence], so does the relevance or probative value." *People v. Smith*, 406 Ill. App. 3d 747, 753 (2010). The defendant highlighted the difference in the victim of the violence and argues that partner abuse is vastly different than child abuse. In addition, the defendant noted that the altercations between the defendant and Adkins were a result of an argument, which

21

obviously would not be an issue with an infant. Lastly, the injuries suffered by L.S. were not caused by a push or a shove.

¶ 60 In response, the State argues that these instances demonstrate that the defendant was violent and angry with Adkins at the time she was pregnant and shortly after L.S. was born, which is illustrative of the defendant's motive and state of mind towards Adkins and L.S. at the time L.S. was abused. The State also suggests that these prior acts of abuse against Adkins disprove that L.S.'s injuries were the result of an accident or a mistake, as the defendant claimed to the police.

¶ 61 The plain-error analysis is a two-step analysis. The first question to determine is whether a clear or obvious error has occurred. *People v. Bates*, 2018 IL App (4th) 160255, ¶ 71. The second step to consider is whether "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Bates*, 2018 IL App (4th) 160255, ¶ 70. Under the plain-error doctrine, the defendant always has the burden of persuasion. *Bates*, 2018 IL App (4th) 160255, ¶ 73. "If the defendant fails to meet his burden, the issue is forfeited, and the reviewing court will honor the procedural default." *Bates*, 2018 IL App (4th) 160255, ¶ 73 The issue of plain error is a question of law, which we review *de novo*. *People v. Williams*, 2022 IL 126918, ¶ 48.

¶ 62 We first turn our attention to the question of whether there was error in the admission of the disputed evidence. Whether evidence is admissible is at the discretion of the circuit court, and its decision will not be reversed absent an abuse of discretion. *People v. Pikes*, 2013 IL 115171, ¶ 12. An abuse of discretion occurs when the decision of the circuit court is arbitrary, fanciful, or unreasonable, or when no reasonable person would agree with the position adopted by the trial court. *People v. Simmons*, 2019 IL App (1st) 191253, ¶ 9. "[I]t is well settled that evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to

commit crimes." *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). Evidence of other crimes has been allowed for the purpose of motive, intent, identity, and accident or absence of mistake. *Dabbs*, 239 Ill. 2d at 283. Evidence of other crimes "will not be admitted if its prejudicial effect substantially outweighs its probative value." *Dabbs*, 239 Ill. 2d at 284. Under the Illinois Domestic Violence Act of 1986, "evidence of the defendant's commission of another offense or offenses of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.4(a) (West 2016). The circuit court must still balance the probative value of the evidence against the risk of undue prejudice. *People v. Irons*, 2017 IL App (4th) 150295, ¶ 26. A circuit court may consider "(1) the proximity in time to the charged or predicate offense; (2) the degree of factual similarity to the charged or predicate offense; or (3) other relevant facts and circumstances." 725 ILCS 5/115-7.4(b) (West 2016).

¶ 63     As discussed in *Dabbs*, evidence of other acts of domestic violence may be admitted even if those acts were perpetrated against another person. *Dabbs*, 239 Ill. 2d at 293. Part of the rationale in that decision was that "an abuser may have a pattern of targeting victims who are vulnerable." *Dabbs*, 239 Ill. 2d at 293. If there is evidence that the defendant committed a similar act, the trier of fact may be persuaded that the current victim is credible because their experience is supported by another victim of the defendant. *Dabbs*, 239 Ill. 2d at 293. Here, L.S. was a vulnerable, premature, four-month-old baby, who could not defend himself. Even though the prior acts of abuse allowed into evidence involved a different victim, Adkins, it did not make those acts irrelevant.

¶ 64     The prior assaults on Adkins were close in time to when the injuries were inflicted on L.S. The first incident happened when Adkins was five months pregnant with L.S. The second act of abuse happened in April 2017, the same month that the injuries to L.S. were discovered. These

23

acts were relevant to the defendant's motive and intent. Both incidents demonstrated that the defendant was violent and, perhaps, angry with Adkins.

¶ 65    Based on the record in this case, the circuit court did not abuse its discretion by allowing evidence of the prior acts of abuse by the defendant. Thus, we find no error in the admission of this evidence. Without error, the defendant cannot establish plain error.

¶ 66                                      C. Sentencing

¶ 67    " '[T]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant.' " *People v. Boots*, 2022 IL App (2d) 200640, ¶ 42 (quoting *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005)). Therefore, a circuit court's sentencing determination will not be disturbed unless there is an abuse of discretion. *Boots*, 2022 IL App (2d) 200640, ¶ 42. A sentence within the statutory limits will only be an abuse of discretion if "it is at variance with the spirit and purposes of the law or manifestly disproportionate to the nature of the offense." *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12. The most important factor in determining an appropriate sentence is the seriousness of the crime, rather than if there are mitigating factors present. *Decatur*, 2015 IL App (1st) 130231, ¶ 12. Further, we will not substitute our judgment for the circuit court because we may have weighed the sentencing factors differently. *Decatur*, 2015 IL App (1st) 130231, ¶ 12. "There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors." *Boots*, 2022 IL App (2d) 200640, ¶ 43.

¶ 68    The sentencing range for aggravated battery of a child is 6 years to 30 years, to be served at 85%. 720 ILCS 5/12-3.05(b)(1) (West 2016); 730 ILCS 5/5-4.5-25(a) (West 2016); 730 ILCS

24

5/3-6-3(a)(2)(ii) (West 2016). The sentence imposed on the defendant was within the sentencing range for the offense for which he was convicted, and 10 years less than the maximum. Thus, we presume that the sentence is proper. *Boots*, 2022 IL App (2d) 200640, ¶ 44. After reviewing the record and noting the serious and heinous nature of the offense, the circuit court did not abuse its discretion.

¶ 69    The defendant argues that the circuit court abused its discretion in sentencing the defendant where it refused to consider the defendant was only 19 years old at the time of the offense, and it failed to consider his lack of criminal history as a factor in mitigation, all of which showed the defendant has great rehabilitative potential. While the Supreme Court has acknowledged juveniles are less morally culpable and are more capable of rehabilitation than adults who commit the same offenses, juveniles may still receive lengthy sentences. *Decatur*, 2015 IL App (1st) 130231, ¶ 16 (citing *Miller v. Alabama*, 567 U.S. 460 (2012)). If the defendant is an adult, his relative youth, standing alone, does not render a sentence longer than the statutory minimum excessive. *Decatur*, 2015 IL App (1st) 130231, ¶ 16. In this case, the defendant was not a juvenile when the offense occurred. Moreover, the circuit court did contemplate the defendant's age, but declined to give it "very much consideration." The circuit court found that the defendant's lack of prior delinquency and criminal history would apply as a mitigating factor. The circuit court considered the nature of the offense. It was important to the court that the defendant severely injured his own child, which he had a duty to protect. It is clear from both the record and the defendant's sentence that the circuit court considered all relevant aggravating and mitigating factors. Thus, we will not reweigh the evidence or replace the circuit court's judgment in reconsidering this sentence.

¶ 70                                    III. CONCLUSION

¶ 71    For the foregoing reasons, we affirm the judgment of the circuit court of Jefferson County.

25

¶ 72    Affirmed.